268 N.J. Super. 387 (1993)
633 A.2d 1009
ANTHONY TODD AND ANTOINETTE TODD, PLAINTIFFS-APPELLANTS,
v.
MICHAEL J. SHERIDAN, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 1993.
Decided November 24, 1993.
*388 Before Judges SHEBELL, LONG and LANDAU.
*389 Charles Matison argued the cause for appellant (Cooper Perskie April Niedelman Wagenheim & Levenson, attorneys; Mr. Matison, of counsel; Christine M. Cote, on the brief).
Arlene Gilbert Groch argued the cause for respondents.
The opinion of the court was delivered by LONG, J.A.D.
This is an appeal from a determination of a trial judge which awarded custody of four year old Nicole Sheridan to her father, Michael Sheridan, over the objections of her grandparents, Antoinette and Anthony Todd, with whom she had resided since birth and who also sought custody.

I
Sheridan and Beth Todd were married in 1983 and on April 9, 1988, Beth gave birth to a daughter Nicole. During Beth's pregnancy, Sheridan became engaged in a romantic liaison with Mary Camp. After Nicole's birth, Mary left her two children with her then husband. Sheridan and Mary moved in together.
Beth returned to live with her parents, Anthony and Antoinette Todd. She was diagnosed with cancer in the fall of 1988, at which time it became nearly impossible for her to care for Nicole. The Todds became the primary caretakers of Nicole, especially Mrs. Todd, who took a leave of absence from work without pay to care for the child.
Sheridan visited Beth once a week on Thursdays between October 1988 and May 1989 to deliver a check to her. He sometimes saw his daughter on these afternoon visits and celebrated Nicole's first birthday with her. By May 1989, Sheridan had become more involved with Nicole, spending Tuesdays with her and having occasional overnight visits. He also took Nicole on special trips.
Beth had papers drawn up for Sheridan to sign which would have made her parents Nicole's guardians in case of her death. *390 Sheridan refused to sign these papers. Beth died April 2, 1990. On November 7, 1990, Sheridan married Mary Camp who was by that time divorced. Sheridan's regular Tuesday visits continued past Beth's death until Tuesday, December 11, 1990. On that date, he called the Todds' home and spoke with Mrs. Todd, explaining that he wanted to keep Nicole and raise her alone.
The Todds filed a complaint for custody and an Order to Show Cause pursuant to which the trial judge ordered Sheridan to return Nicole to the Todds who were also awarded temporary legal custody. A hearing was held on eleven dates from January to June 1992.
The hearing basically focused on the issue of whether Sheridan or the Todds would be better primary caretakers of Nicole. This necessitated much testimony as to the parties' backgrounds as well as the background of Mary Camp Sheridan. The following is a brief outline of that testimony.
Sheridan married Terry Coyle in 1977 when they were twenty and eighteen years old respectively. One child, Stacey, was born of the marriage. His relationship with Stacey was not strong. According to Terry Coyle's sister, Marie, he had little interest in seeing Stacey when she was young. According to Sheridan, his relationship with Stacey faltered because Terry "tried to keep her away from [him] as much as possible, at that time." Nonetheless, he tried to see her and faithfully paid child support for Stacey in accordance with a court order in the amount of fifteen dollars a week.
In recent years as Stacey entered adolescence, Sheridan has had more contact with her because of her problems with her mother. Stacey spent the summer of 1991 with the Sheridans. She was fourteen years old. Stacey's mother objected to Stacey's living with the Sheridans and agreed to have Stacey live with her maternal grandmother.
During the summer Stacey stayed with Sheridan, she was allowed to double-date with Mary's daughter, Jennifer, who is one *391 year older. Both had boyfriends who were eighteen during the summer of 1991. Mary first discussed birth control with Stacey during that summer. In June of 1991, Mary took Stacey to a clinic for birth control pills for the first time. Mary made no effort to contact Stacey's mother or grandmother before taking her for birth control pills. Mary testified that she consulted with her husband and that she thought Stacey's mother would approve. The mother testified that she did not approve. Sheridan characterizes his present relationship with Stacey as a good one.
Mary Sheridan has three biological children. The oldest, Jennifer, was born out of wedlock when Mary was nineteen years old and was raised by Mary. In 1982, Mary married Bill Camp. She has two children from that marriage, Johanna and Billy. They were approximately five and one years old, respectively, when Mary left home. Mary and Bill Camp were divorced in 1989. She maintains a good relationship with him and her former in-laws and participates in family outings with them. Although Bill Camp is the custodial parent, Mary Sheridan has liberal access to Johanna and Billy and sees them often. Until the current litigation, Mary was under the impression that the divorce decree granted her joint custody of Johanna and Billy although the agreement actually states that Bill Camp has custody of them while Mary has custody of her older daughter, Jennifer. Mary testified in court that she had a tubal ligation and could only have more children if she has a reversal.
Michael Sheridan admitted to using marijuana and cocaine in the past. He testified that he ceased drug use in October of 1987. He was arrested in 1975 for possession of a weapon and served thirty days in county jail for the offense. In 1987, he was arrested for DWI for which he pleaded guilty. The police found methamphetamine on him when he was arrested. A number of witnesses testified that he sold drugs in the past. No one testified that defendant currently uses or sells drugs. During interviews with his expert psychologist, Sheridan unequivocally denied that he had *392 ever sold drugs. The trial judge found "as a matter of fact" that Sheridan did sell drugs and that he lied about it.
The Todds have raised five children including their deceased daughter, Beth. Mrs. Todd testified that she and her husband have a warm and loving relationship with their children. Mrs. Todd knew that Beth used drugs for about ten years prior to her pregnancy and never discussed it with her husband. Mrs. Todd was also aware that her daughters, Karen and Dianne, used drugs. She did have discussions with her children about the dangers of using and selling drugs.
The Todds' daughter Karen, who is in her twenties, lives with them. All five of the Todd children graduated from high school. Only the youngest child, a son, has attended college. Mr. Todd is a retired firefighter. He has worked a second job most of his life. Mr. Todd has had several episodes of depression and was, at the time of trial, under treatment for depression. The Todd marriage is essentially solid. Both of the Todds smoke.
Nicole is attached to both her father and the Todds and is treated very well by all parties according to the expert witnesses. Both experts agreed that Nicole would be provided a good home with either the Sheridans or with the Todds. The Todds' expert, Dr. Pokalo, testified that Nicole needed stability and should stay with her grandparents, although she should spend more time with her father. Sheridan's expert, Dr. Mosley, recommended that Sheridan should have custody of Nicole, but that the move to custody should be gradual. He further recommended that the grandparents should have regular visitation with Nicole.
Dr. Pokalo opined that the grandparents are Nicole's "psychological parents." Dr. Mosley argued that Nicole's relationship to the Todds is "close" to that of a child-parent relationship, but disagreed that the Todds are her "psychological parents." Rather, Dr. Mosley believed that Nicole has "bonded with the Todds and Mr. Sheridan." Dr. Mosley stated that if he found that Sheridan had indeed sold drugs, it would "have to change my entire evaluation because that would be built on the premise that *393 much of the information he gave me was incorrect, if that fact were true."
The trial judge ruled in favor of Sheridan. In so doing, he considered criteria set forth in N.J.S.A. 9:2-4. These factors include but are not limited to:
the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow visitation not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.

[N.J.S.A. 9:2-4(c).]
He analyzed the parties' ability to communicate and cooperate with each other and found that the Sheridans are more willing to do so than the Todds. With regard to the parties' willingness to accept custody, the trial judge found that "each party has a willingness to accept custody of Nicole for reasons not inimical to her best interests." On the other hand, he found that the Todds are firm in their resolve against further interaction between Nicole and her father, and are not aware of the harm Nicole might suffer "if they continued their negative stance toward increased interaction by her father." The trial judge found no such belligerence on the part of the Sheridans.
The judge found it "evident that Nicole is very comfortable in her relationships" with both parties and that "neither household presents a risk of violence of any kind." He accepted the analysis of the Todds' expert witness that "Nicole could thrive in either of the homes in question," although he ultimately accorded more weight to Dr. Mosley's opinion.
The judge identified three problems in the opinion of the Todds' expert, Dr. Pokalo. First, he found her opinion "stale" because it *394 was made in April 1991 and had not been updated by the time of the trial in 1992. Second, he found that she did not weigh strongly enough the negative influence of the Todds' opposition toward Sheridan. Finally, he found that her opinion was too narrowly focused and did not take into account Nicole's thoughts and perceptions as she grew older. On the contrary, he found that the opinion of Dr. Mosley was based "more upon current circumstances, is more comprehensive in its projection of Nicole's future needs and in its totality, more persuasive...."
Regarding the stability of the home environment, the judge prefaced his statement by noting that the Sheridans' previous marriages and infidelities "are of little concern to [him] in assessing the likelihood of the Sheridans' love and affection for Nicole continuing." Nonetheless, he found that the Todds "present the greater promise of a permanently stable home environment for Nicole."
Regarding the fitness of the parties, the judge found that Mr. Todd failed to disclose his history of depression in order to "place himself in the most favorable light possible" and that Mr. Todd was "otherwise credible." He stated that "he was not in the least bit troubled" by Mr. Todd's past episodes of depression. He also found that the ages of Mr. and Mrs. Todd, fifty-three and fifty-two respectively, were not a negative factor since they were active and healthy. The judge also discounted the Sheridans' attack on the Todds' willingness to let adult children live in their home as a "matter of philosophical difference, not patently erroneous."
On the fitness of Sheridan, the judge found on the basis of the testimony of a number of witnesses that Sheridan did sell marijuana and lied about it to the court. He did not find any evidence that Sheridan has sold marijuana since 1988 and stated that that past behavior did not render Sheridan unfit to be a good parent. The trial judge disagreed with the conclusions of Dr. Mosley in this connection. Dr. Mosley believed that his own testimony should be discounted if Sheridan were later found to have lied about his sale of drugs; not because the distribution would have *395 rendered Sheridan unfit, but rather, because Sheridan's credibility as to other information on which he relied for his opinion would be suspect.
The judge found that Dr. Mosley's opinion need not be totally discounted because of his finding that Sheridan lied about his past drug distribution. The judge noted that Sheridan's testimony during the trial was "otherwise credible" and, with that exception, he did not lie to the experts. In his explanation for discounting the importance of Sheridan's untruthfulness, the trial judge stated that he probably believed his past involvement with drugs would prejudice the court against him. The last negative factor the trial judge found regarding Sheridan was his self-focus and insensitivity. Despite these qualities, the judge found that Sheridan was otherwise fit.
As to Mary Sheridan, the judge drew no negative conclusion from the fact that she does not have custody of her youngest children. "Rather, it may be said that a mother who can forego her own possessory interest in favor of recognizing the situational benefits of her children living with the other parent may be an excellent mother." He also drew no negative inference from Mary's involvement with aiding Sheridan's older daughter in obtaining birth control. Rather, the judge found that it may have been the prudent thing to do since the daughter was already sexually active.
With regard to the amount and quality of time spent with Nicole prior and subsequent to the termination, the judge found that Sheridan did show a lack of interest in his daughter when she was very young, but that his interaction with her has increased to the point that it diminishes the importance of his earlier behavior.
Regarding the parties' respective employment responsibilities, the judge found that the Todds had been caring for Nicole full-time although they did send her to pre-school because they believed she could benefit from it. Although the Sheridans both work full time, the trial judge found that their employment responsibilities did not preclude their ability to care for Nicole, *396 especially in view of Mary's professed willingness to change her schedule, and the fact that Nicole would begin school in 1993.
In short, the judge found the parties to be relatively equal in many factors. However, he found differences in other areas: the parties' communication and cooperation with each other; their unwillingness to share visitation; their parental fitness; their marital/family stability; and time spent with Nicole. In the first two of these areas, the judge found problems with the Todds' behavior toward Sheridan but not vice versa. In the third area, the judge found all parties fit to be parents, although he did make note of Sheridan's prior criminal behavior and his reason for discounting it. The judge found much more stability in the Todds' home than in the Sheridans', although he indicated that Sheridan's maturity and experience will have a positive effect on his marital stability. Finally, with respect to time spent with Nicole, the judge found that Sheridan has compensated for his early lack of interest in the child by his behavior prior to and during the course of litigation.
The Todds appeal, contending that the trial judge applied the wrong standard in transferring custody of Nicole to Sheridan; that he erred in relying on Sheridan's expert, whose opinion was nullified by the judge's other findings; that Nicole's best interests required her placement with them and that Beth's wishes should have been considered in the placement of Nicole.

II
We turn first to the question of the standard to be applied in a case such as this. The parties agreed below that the case is governed by Zack v. Fiebert, 235 N.J. Super. 424, 563 A.2d 58 (App.Div. 1989). In Zack, we addressed the traditional rule that in an action between a third party and a biological parent, the third party may be awarded custody only if he or she overcomes the presumption in favor of the natural parent by proving the natural parent's unfitness. We held that where a "third party is able to show that he or she stands in the shoes of a parent to the child *397 and thus in parity with the natural parent, he or she should be accorded the status of a natural parent in determining the standard to be applied to the quest for custody. In such circumstances, the best interests test should apply." 235 N.J. Super. at 432, 563 A.2d 58.
Despite their consent to the application of the Zack standard below, on motion for reconsideration and on appeal, the Todds argue that because Nicole had been in their custody, Sheridan should have been required to prove "changed circumstances" in order to prevail. This theory is based, in part, upon N.J.S.A. 9:2-5, which sets out a process for deciding custody upon the death of a custodial parent:
[I]n the case of the death of the parent in whose custody the children actually are, when the parents have been living separate and no award as to the custody of such children has been made, the care and custody of such minor children shall not revert to the surviving parent without an order or judgment of the Superior Court to that effect. The Superior Court shall have the right, in an action brought by a guardian ad litem on behalf of the children, to appoint such friend or other suitable person, guardian of such minor children, and shall have the right to remove such guardian, and to appoint a new guardian or guardians, and to make such judgments and orders, from time to time, as the circumstances of the care and the benefits of the children shall require.
The Todds claim that pursuant to this statute, they are not only on equal footing with Sheridan as dictated by Zack but in an enhanced status warranting application of the changed circumstances rationale. This argument is based upon an overreading of N.J.S.A. 9:2-5 which provides that in a case such as this, in which Nicole's custodial status had never been reduced to judgment prior to Beth's death, her custody did not automatically revert back to the custody of Sheridan. Although Sheridan tried to retain Nicole without a judgment, the trial judge righted the situation upon the Todds' complaint by granting them temporary legal custody until a hearing could be held. That is all they were entitled to under N.J.S.A. 9:2-5. The fact that Sheridan's automatic accession to custody of his natural child was eliminated by the statute does not concomitantly enhance the status of those *398 who, like the Todds, either by designation or happenstance, take over custody in the deceased parent's stead.
The most that can be said of the Todds' custody of Nicole is that it was the status quo. From this they argue, citing Mastropole v. Mastropole, 181 N.J. Super. 130, 436 A.2d 955 (App.Div. 1981), that as in the case of two natural parents in a dispute over a change of custody, the proper standard is changed circumstances and not the Zack best interests test. Not so. Mastropole, like its progenitor, Sheehan v. Sheehan, 51 N.J. Super. 276, 143 A.2d 874 (App.Div. 1958), addressed a situation in which custody was awarded pursuant to a judgment and a change in the judgment was sought. It is the absence of a judgment awarding custody to the Todds which differentiates this case from Mastropole and Sheehan. A judgment, whether reached by consent or adjudication, embodies a best interests determination. It is only when such a determination has been made and a judgment entered that a moving party must bear the threshold burden of showing changed circumstances which would affect the welfare of the children. Sheehan, 51 N.J. Super. at 287, 143 A.2d 874. Plainly, Sheehan and Mastropole do not prescribe a third standard in addition to the "parental unfitness" and "best interests" tests. Rather, they clarify the circumstances under which a prior judgment may be disturbed, that is, when there are changed circumstances which would have an impact on the child's welfare. In effect, these cases explain the use of the "best interests" standard; they do not replace it. Thus, in the absence of a prior judgment in favor of the Todds, the trial judge properly applied the best interests test of Zack v. Fiebert.

III
The Todds next urge that insofar as Zack placed them in parity with Sheridan in the custody dispute over Nicole, he erred in giving any consideration whatsoever to Sheridan's status as Nicole's natural parent. We disagree. The Todds received the benefit Zack was meant to accord them when they were not *399 compelled to prove Sheridan's unfitness in order to obtain custody. That is the full import of Zack. No fair reading of that decision prohibits a judge from considering any aspect of either party's character or status in assessing the best interests of the child. N.J.S.A. 9:2-4. Obviously, as the trial judge recognized, he was not free to give an absolute preference to Sheridan because that would have undermined the salutary aims Zack was meant to accomplish. However, he was free to consider Sheridan's status as Nicole's biological father as one weight in the best interests balance.

IV
The Todds next contend that the trial judge erred in failing to give weight to a crucial qualification in the testimony of Sheridan's expert witness. Because we agree with this contention, we reverse and remand.
The record reveals that, in reaching his conclusion, the trial judge relied heavily on Dr. Mosley's opinion that Sheridan should have custody of Nicole. In so doing, he elected to discount Dr. Mosley's caveat that his opinion would be altered if it were later found that Sheridan had lied about his previous involvement in drugs, because the expert believed that such a lie would put all his conclusions into question. Dr. Mosley's views are reflected in the following exchange which took place at trial.
BY THE COURT:
The last thing  one of the last things you said, that assuming as fact that if Michael were selling drugs out of the home that he occupied with Beth and Nicole, that that would be very important and that I believe you said it would have to change your opinion, but you didn't say what or how it would change your opinion. Could you tell us how it would change your opinion?
ANSWER:
I had spoken to Mr. Sheridan at length, and I said, "If this  I'm accepting this as truth," and I questioned him many times. If I find it to be otherwise, that's really going to change my entire evaluation because how can I accept the other things he's told me as true? I have said to this Court that I believe he's been truthful with me, based on the psychological testing information reported to me. If I were to find that fact, after directly confronting him, then I'd have to change much of what he's told me. I'd have to reconsider much of what he's told me.

*400 QUESTION:
So it would be a credibility issue 
ANSWER:
That's right, your Honor.
QUESTION:
 and would simply place into doubt all of your findings.
ANSWER:
The findings in terms of what he has related to me and mentioned to me, and probably cast less of a problem on my observations of Nikki with him. That much wouldn't change because that's sort of separate, but it would certainly cast doubt on his credibility of what he's reported to me. His motivations, his caring for his daughter, I would have to put all that into a credibility issue.
QUESTION:
If you were to be satisfied that the reason he lied to you was out of his feeling that if he were honest with you about the allegations of drug sale and when they occurred, that that would put an end to attempt to get custody of Nicole?
ANSWER:
No, that would not satisfy me because I said to him  I have to  because I said to him directly, "It's better for you to tell me now and be up front, and I know that"  and I asked him several times. "It's better for you to tell me now and be honest about it, because then I can proceed and feel comfortable with the rest of the information you're telling me." So if after that question a couple of times, I were to find out it was true, then I'd have to really question a lot of the credibility."
In his opinion, the trial judge made a specific factual finding that Sheridan was engaged in selling drugs prior to 1988, which finding is amply supported by the record. However, he did not discount Dr. Mosley's conclusions. In his opinion, the judge addressed the issue this way:
A more substantial issue presented is the one which arises from Dr. Mosley's treatment of defendant's alleged drug distribution. Aware of such allegations, Dr. Mosley testified that he had confronted defendant with the information at the time of his evaluation and stressed the importance of the defendant being honest about it  saying essentially, if it's true, it can be dealt with but if it's true and you deny it, that it could not be dealt with. Defendant denied the truth of the allegations and Dr. Mosley therefore, assumed they were not true. When testifying Dr. Mosley was asked if the allegations were in fact true what effect it would have on his opinion. Dr. Mosley testified that his opinion would have to be discounted  not because the fact of defendant's drug distribution would render him unfit, but because his credibility as to other matters on which Dr. Mosley relied would be suspect.
The finder of fact is free to accept all, some, or none of an expert witness's opinion. In this case I find that Dr. Mosley's opinion need not be totally discounted based upon my conclusion that defendant has lied about his past involvement in drug *401 distribution. Based upon the content of defendant's testimony and my observation of his demeanor I am satisfied that he was otherwise credible during his testimony and that he otherwise did not lie to Drs. Pokalo and Mosley. Moreover, there are few, if any, significant points of issue of fact which in this case turned singularly on the defendant's credibility alone. I think it likely that defendant believed that his selling of marijuana in the past would so prejudice the Court against him, that he made the unwise decision to lie about it. Thus as has already been seen, I have accepted Dr. Mosley's recommendation of defendant's fitness.
What is before us is not whether a trial judge can accept some of an expert's opinion but not all. A judge, like a jury, plainly has power to do this. County of Middlesex v. Clearwater Village, Inc., 163 N.J. Super. 166, 174, 394 A.2d 390 (App.Div. 1978). Nor is the issue quite what is posited by the Todds  that Dr. Mosley's testimony is infirm because the facts underlying it are not true. Dr. Mosley's expert testimony is impervious to attack on this ground because he specifically tailored his opinion to a set of assumptions and specifically withdrew it if those assumptions turned out to be untrue. The problem is that the trial judge invalidated the assumption on which Dr. Mosley's opinion was based (that Sheridan was truthful when he said he never sold drugs) while honoring the opinion which Dr. Mosley himself had disavowed. An expert opinion is entitled to no greater weight than the facts and reasoning upon which it is based. Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984). Once the judge found that an essential factual basis of Dr. Mosley's opinion was false, it was error for him to rely on it. This is especially true because Dr. Mosley said he would disavow his own opinion if it were established that Sheridan had formerly sold drugs and had lied to Dr. Mosley about it. In short, when an expert communicates that his own opinion should be discounted if the facts turn out to be different from those upon which he relied, the fact finder may not rely upon that opinion once the factual basis has been undermined.
The judge had two choices when he made the findings which shook the foundations of Dr. Mosley's opinion: to allow Dr. Mosley to reconsider the matter in light of the judge's findings as to Sheridan's drug selling or to decide the case without Dr. *402 Mosley's expert opinion. The option he did not have was to base his determination on an opinion which Dr. Mosley had disavowed. It is apparent from the judge's exchange with Dr. Mosley that the judge viewed Sheridan's lack of candor with respect to his drug selling rather humanely and did not consider it to reflect on his overall credibility. To Dr. Mosley, however, it was a make or break issue; not because he equated the drug sales with unfitness, but because his assessment of Sheridan relied heavily on Sheridan's responses to his probing questions. To him, it was fundamental that the answers be true. If those responses were proven false, Dr. Mosley said it would "change [his] entire evaluation."
Unfortunately, this is not a case in which we can say the judge's reliance on Dr. Mosley's opinion was de minimis. The case was an extremely close one which, without expert opinions, probably favored the Todds. Dr. Mosley's opinion obviously tipped the scales. Indeed the judge rejected Dr. Pokalo's conclusions in favor of it. While there are some areas of Dr. Mosley's opinion which could survive this analysis, for example, those based on observations of interaction between Nicole and Sheridan, the ultimate opinion ascribed to him by the judge was not the one he rendered and cannot serve as a basis for the judge's conclusions.
We thus reverse and remand the case to the trial judge to reconsider his opinion without Dr. Mosley's evidence or to reconsider it after obtaining an opinion from Dr. Mosley in light of the finding that Sheridan had lied and had indeed sold drugs. The remand should be completed within forty-five days. Upon receipt of the judge's new ruling, the parties may simultaneously exchange supplemental appellate briefs within fifteen days.
Jurisdiction is retained.