

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-2-2001

# In Re:Four Three Oh, Inc.

Precedential or Non-Precedential:

Docket 00-2135

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"In Re:Four Three Oh, Inc." (2001). *2001 Decisions*. Paper 145.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/145

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 2, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2135

IN RE: FOUR THREE OH, INC.,
        Debtor

BOARD OF ADJUSTMENT OF THE
TOWNSHIP OF NORTH BERGEN, THE,
        Appellant

v.

B.A.P.S. NORTHEAST, INC.;
MICHAEL B. KAPLAN, Chapter 11 Trustee;
TOWNSHIP OF NORTH BERGEN, THE, a Municipal
Corporation of the State of New Jersey;
FOUR THREE OH CORP.

Appeal from the United States District Court
For the District of New Jersey
D.C. No.: 99-cv-06002
District Judge: Alfred M. Wolin

Submitted Under Third Circuit LAR 34.1(a)
February 27, 2001

Before: NYGAARD, ALITO, and ROSENN, Cir cuit Judges.

(Filed: July 2, 2001)

        Gerald J. Monahan, Esq.
        322 48th Street
        Union City, NJ 07087
        Counsel for Appellant

         Robert L. Podvey, Esq.
         Podvey, Sachs, Meanor, Catenacci,
         Hildner & Cocoziello
         One Riverfront Plaza
         Newark, NJ 07102
         Counsel for Appellees

OPINION OF THE COURT

ROSENN, Circuit Judge:

This appeal has its origin in BAPS's[1] application to the
North Bergen Board of Adjustment ("BOA or "the Board")
for a use variance which would permit BAPS to use the
subject property as a temple for Hindu worship. BAPS had
agreed to purchase the property fr om the trustee in
bankruptcy for Four Three Oh, Inc. on the condition that it
receive approval from the Township of North Bergen for its
desired use. The application process dragged on for over
two years, and finally culminated in the BOA's insistence
that BAPS hire off-duty police officers to direct traffic and
insure compliance with the occupancy limit for the temple
set by the BOA. The Bankruptcy Court held that this
condition was unreasonable and issued an injunction
requiring the BOA to allow BAPS to use its own uniformed
volunteers for traffic direction and occupancy limit
compliance. The BOA appealed this order to the United
States District Court for the District of New Jersey, which
affirmed. The Board timely appealed to this Court. We also
affirm.

I.

This controversy began in November of 1998, when the
United States Bankruptcy Court approved the sale to BAPS
of the subject property which previously had been owned
by Four Three Oh, Inc., a debtor in Chapter 11
proceedings. The sale of the property, which had been used
_____

1. BAPS is an acronym. The full name of the organization is
Bochasanwasi Shree Akshar Purushottam Swaminarayan Sanstha.

2

by the prior owner as a nightclub, was contingent upon BAPS obtaining permission from the BOA to use the land as a house of worship.

BAPS applied to the Township of North Bergen for a Certificate of Occupancy to permit the property to be used as a place of worship. Because the property is located in an industrial zone, the Township denied the application on the ground that a use variance was required under New Jersey law. BAPS then filed an application for the necessary use variance with the BOA, who scheduled the matter for a hearing in January, 1999.

Over the next several months, the BOA repeatedly postponed the hearing. As a result, the Chapter 11 trustee and BAPS jointly commenced an adversary proceeding in the Bankruptcy Court seeking an injunction requiring the BOA to grant BAPS's pending application for a variance. The Bankruptcy Court denied the injunction, but remanded the matter to the BOA for a hearing, ordering it to issue a final decision on the BAPS application by October 6, 1999.

The first remand hearing occurred on September 22, 1999. The BOA heard testimony from several experts, including Derrick McGrath, the BOA's engineer, who identified numerous problems with the site that BAPS needed to address. Most of these problems were later discussed by BAPS's engineer, Bhaskar Halari, who explained that BAPS could and would remedy them. One of the chief problems McGrath identified was the fear that the property had insufficient parking spaces to accommodate its anticipated use. In response to this concern, Kishor Joshi, BAPS's architect, testified that BAPS was willing to limit the temple's occupancy based on the number of available parking spaces.

The number of parking spaces that would be available for worshippers' use is a matter of dispute. Part of the land on which the former nightclub was situated is currently leased to a fast food restaurant (Taco Bell). Although Taco Bell's lease is silent on the issue of parking, Michael Kauker, the North Bergen town planner, had previously testified that, based on the number of seats in Taco Bell, the restaurant was entitled to exclusive use of 27 parking spaces. Joshi

3

accepted this conclusion and calculated that the temple would be left with 165 spaces. He offer ed to limit the occupancy of the temple to 3.5 persons per parking space, or 578 persons.

The BOA then heard testimony from Michael Maris, BAPS's traffic expert. He testified that he had studied the traffic conditions on the avenue adjacent to the property and, using a "peak load factor" of .9, he calculated that the property would have a C Level of Service,[2] acceptable under Federal standards. Maris based this calculation on BAPS's agreement to limit itself to 165 parking spaces.

On September 28, 1999, the BOA heard testimony from its own traffic consultant, Hal Simoff. Using the same methodology as Maris, he concluded that the temple's driveways would operate unsafely, with a level of service rating of F. However, Simoff used a peak load factor of .7, which, on cross examination, he conceded was incorrect. He then agreed that a peak load factor of .82 would be more appropriate and would yield a D Level of Service, which Maris testified was still acceptable (under federal standards). Simoff later testified that, based on his reading of the metes and bounds description in the T aco Bell lease, Taco Bell was entitled to 65 parking spaces. Although it received notice of this litigation, Taco Bell never appeared or asserted any claim.

Between the second and final scheduled hearing dates, BAPS wrote a letter to the BOA offering to limit its occupancy to 505 persons, even though the number of available parking spaces would permit a building occupancy of 578 persons under the relevant North Bergen ordinance. Under the ordinance, a building with an occupancy limit of 505 required only 143 parking spaces.

The final hearing on the BAPS application took place on October 6, 1999. Simoff again testified at this hearing, but

_____

2. A property's "Level of Service" r efers to the amount of time it takes a
vehicle to exit the driveway. Level of Service A means a delay time of less
than ten seconds. Level of Service F, which is generally unacceptable, means a delay time of greater than 50 seconds. The property currently operates with a "B" Level of Service.

this time he limited his testimony to BAPS's existing facility in nearby Edison Township. Simoff claimed that BAPS had misrepresented its proposed use of that facility before the Edison land use board and that BAPS had made architectural changes to the Edison building without first obtaining the requisite municipal approval. However, Simoff once again retracted his testimony on cr oss-examination when confronted with approved site plans for the Edison facility. These plans proved that BAPS had, in fact, obtained the approval of the township befor e altering its building.

At the end of the final hearing, the BOA denied BAPS's application for a variance, citing occupancy, traffic, and parking problems. BAPS appealed this decision to the Bankruptcy Court, which reversed the denial, concluding that the Board had acted arbitrarily in r efusing to consider reasonable restrictions that would alleviate problems with occupancy, parking, ingress and egress. The Court remanded the application back to the Boar d to consider such restrictions.

On remand, the BOA required, as a condition of granting the variance, that BAPS hire off-duty police officers to monitor traffic entering and exiting its parking lot. This condition was financially burdensome and, as it turned out, impossible to fulfill, because the chief of police later informed BAPS that off-duty officers were not available. The BOA refused BAPS's offer to have its own volunteers perform this function, and BAPS once again brought the matter to the attention of the Bankruptcy Court. This time, the Court held that this condition was arbitrary and unreasonable. It vacated the proposed condition and ordered BAPS's application for a variance approved, allowing BAPS volunteers to monitor the trafficflow in the temple parking lot. The BOA appealed this or der to the District Court, which affirmed.

II.

The first question before us is whether the District Court applied the correct standard of review. The District Court reviewed the bankruptcy court's factual findings for clear

5

error, while subjecting its legal conclusions to plenary review. Although this is the standard that normally applies to appeals from bankruptcy decisions, see In re Sharon Steel Corp., 871 F.2d 1217, 1223 (3d Cir . 1989), this case reached the District Court in an unusual pr ocedural posture. The Bankruptcy Court had effectively reviewed the decision of the Board of Adjustment, an administrative body created under state law. Under similar cir cumstances, the Court of Appeals for the Eight Circuit explained the standard of review as follows:

> [W]e are reviewing neither the legal rulings of the bankruptcy court nor its findings of fact. W e are reviewing the judgment of a district court affirming a bankruptcy court decision giving effect to a decision of the [administrative agency]. In substance, we are reviewing the decision of an administrative agency.

Id. at 1390 (internal citations omitted).

When a federal court reviews a decision of a state agency, it must grant that agency's factual findings the same degree of deference to which they would be entitled if they were reviewed by a state court. See AT&T W ireless PCS v. Winston-Salem Zoning Board, 172 F .3d 307, 315 (4th Cir. 1999). If the BOA's decision had been reviewed in the state court system, the Law Division of the New Jersey Superior Court would have exercised a deferential standard of review. Its review would have been limited to determining whether the BOA's decision was supported by "substantial evidence" and whether it was "arbitrary, unr easonable or capricious." Pullen v. S. Plainfield Planning Bd., 291 N.J. Super 303, 311-12, 677 A.2d 278, 282 (Law Div. 1995)("Pullen I"). The Law Division would have acted as a reviewing court, not a trial court, and would have reviewed the BOA's factual findings based on the recor d of the proceedings before the BOA. See Pullen I, 291 N.J. Super at 312.

On appeal, the Appellate Division's review of the Law Division's decision would have been de novo. The Appellate Division would have conducted its own review of the record before the BOA, using the same arbitrary and capricious standard. See Pullen v. Township of S. Plainfield Planning

6

Bd., 291 N.J. Super. 1, 6, 676 A.2d 1095, 1097(App. Div. 1996)("Pullen II").

In this case, the Bankruptcy Court applied the corr ect, deferential standard of review, but the District Court did not. When the Bankruptcy Court's decision was appealed to the District Court, the District Court functioned as a second-level reviewing court. Its standar d of review should have been plenary. See, e.g. AT&T Wireless, 172 F.3d at 314-315; C.K. v. New Jersey Dept. of Health & Human Services, 92 F.3d 171 (3d Cir. 1996); Bankruptcy Estate of United Shipping v. General Mills, 34 F.3d 1387 (8th Cir. 1994).

In similar cases in which the District Court, functioning in an appellate capacity, applied the wrong standard of review, we have nevertheless reached the merits of the appeal.3 In light of the alr eady long duration of this litigation in the court below, we will not r emand but decide the merits. For reasons fully discussed her einafter, we believe the record of the BOA proceedings reveal that it acted arbitrarily, capriciously and unreasonably in denying the variance sought by BAPS. As we explain in Part III, the District Court did not err in affirming the decision of the Bankruptcy Court.

III.

Under New Jersey law, a town planning board should grant a variance for a proposed land use that is "inherently beneficial" if the applicant satisfies a four –prong test. See Sica v. Board of Adjustment of the Township of Wall, 127 N.J. 152, 165-66 (1992). The parties here agr ee that the proposed temple constitutes an "inher ently beneficial" use of the subject property. Accordingly, the Sica decision requires the BOA to first identify the public interest involved and then identify the "detrimental ef fect that will

_____

3. See, e.g., In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 263 n.2 (3d Cir. 1991)(finding that the District Court had applied the wrong standard of review when reviewing a Bankruptcy Court's decision and proceeding to reach the merits of the appeal); In re Vertientes, Ltd., 845 F.2d 57, 58 & 59-60 (3d Cir. 1988)(same).

7

ensue from the grant of the variance." Id. at 165–66. Next, the Board should, when possible, consider r easonable conditions on the use that would reduce its detrimental effect. See id. Finally, the Boar d should "weigh the positive and negative criteria and determine whether , on balance, the grant of the variance would cause a substantial detriment to the public good." Id. In doing so, the Board should reduce the weight of the negative criteria to the extent that their effect could be reduced by the imposition of reasonable conditions. See id.

We agree with the District Court and the Bankruptcy Court that the Board failed to seriously undertake the balancing test required by Sica. The BOA cited three negative criteria to support its denial of the variance: alleged overuse of the BAPS facility in Edison, a shortage of parking, and traffic problems. The recor d shows little support for any of these concerns. First, as the Bankruptcy Court noted, there is no evidence in the r ecord, except for Simoff 's discredited testimony, to support the allegation that BAPS misrepresented its anticipated use to the Edison board.

The Board also relied on Simoff 's admittedly faulty analysis to support the conclusion that BAPS's pr oposed use of the site would cause traffic problems. Simoff himself conceded that the peak load factor used by BAPS's traffic expert, which led to the conclusion that the T emple would not unduly hamper traffic, was more appr opriate than the one he used, and would yield an acceptable Level of Service. Thus, we agree that the Board's r eliance on Simoff 's traffic calculations was unr easonable.[4]

_____

4. The dissent contends that Simoff 's error in calculation "related only to
the ability of cars to exit the proposed temple's parking lot, leaving
unaffected any conclusions about . . . the ability of cars to enter the
lot."
(Dis. op. at 16). However, Maris testified that the ability of vehicles to exit
the site was the most critical consideration in analyzing the feasibility of
the proposed use. He stated that, because cars attempting to enter the
proposed lot only need to make a right tur n off Route 1 and 9, "the
entering traffic is not critical." He also testified that the number of
vehicles attempting to enter the parking lot at the peak entering hour
was far lower than the number of cars attempting to exit at the peak
exiting hour. Neither of these conclusions has been contradicted.

8

Furthermore, the Temple's peak hours of operation would fall on Sunday evenings from four to nine p.m. According to Maris's uncontradicted testimony, which was based on his personal knowledge and study of local traffic conditions, Route 1 & 9 is not heavily trafficked during those hours. Maris testified that the traffic problems on Routes 1 & 9 occur during weekday commuter hours. Although BAPS does offer services during those hours, its experience at its Edison facility reflects that week-day services are sparsely attended, usually drawing only 10-15 worshipers.

Finally, the Board's concern about parking also lacks a foundation. Here, again, the Board r elied on the testimony of Simoff, a non-lawyer, who opined that, based on his reading of the Taco Bell lease, T aco Bell was entitled to 65 parking spaces. The lease, however, is silent on the issue of parking.5 Moreover, Simoff 's testimony was contradicted by that of North Bergen's own town planner , who testified that Taco Bell needed only 27 spaces, which would leave BAPS with more than enough parking for a temple with an occupancy limit of 505. Finally, we note that, four years ago, this Board approved the use of this very site as a nightclub. Although the nightclub's occupancy limit was 700, the Board expressed no concer n over the amount of available parking. The existence of this prior appr oval calls into question the genuineness of the BOA's contention that it denied the BAPS application due to inadequate parking.6

Even if there were some factual basis for the concerns articulated by the Board, we would still affirm the judgment

_____

5. We also note that, although Taco Bell has received notice of the existing action, it has not appeared to defend its right to any parking spaces.

6. The dissent asserts that the BOA approved the use of the site as a nightclub because a nightclub attracts patrons "late at night when street parking may be more available and trafficflow is lighter." (D.C. at 18) This is pure speculation. Nothing in the r ecord suggests that parking on Route 1 and 9 is available late at night, but not on Sunday evenings. Moreover, contrary to the dissent's suggestion, Maris testified that entry into and exit from the parking lot would be mor e evenly spread throughout the temple's hours of operation than would entry to and exit from a church or synagogue. He stated that, at BAPS's temple in Edison, "people kept coming in throughout the day."

of the District Court because the Board shirked its duty under Sica to seriously consider conditions designed to alleviate any negative impact that would flow fr om the grant of the variance. The record reveals that BAPS proposed numerous conditions,7 fr om reducing the size of its prayer hall to reducing the occupancy limit of its temple, which should have quieted the Board's concerns about over-use, parking and traffic. The Board rebuf fed all of these proposals for no apparent reason. Its president simply concluded that "no organization would voluntarily limit its membership."

Finally, we also note that the Bankruptcy Court vacated the condition that the Board ultimately chose to impose on BAPS's use of the site, the hiring of off-duty police officers at BAPS's expense to direct traffic and monitor compliance with the occupancy limit. We agree with the Bankruptcy Court that this condition was arbitrary and unr easonable. The Board refused to allow BAPS's own volunteers to direct traffic and monitor occupancy, concluding that they could not be trusted to do so. We believe that this conclusion, which has no basis in the record, further supports the Bankruptcy Court's decision that the Board acted arbitrarily and unreasonably in denying the variance.

IV.

In sum, we agree with the Bankruptcy Court that the Board acted arbitrarily and unreasonably. The judgment of the District Court will be affirmed. Costs taxed against appellant.

_____

7. The dissent believes that it was reasonable for the BOA to question whether BAPS would be willing to turn people away at the door once 505 people had entered the temple if there was room for more. (Dis. op. at 17). On the contrary, it is unreasonable and unfair for the BOA to postulate in the absence of any evidence that BAPS would violate its agreement to limit occupancy. Occupancy limits are quite common in dance halls, dining rooms, elevators and other structures. Besides, if BAPS were to violate this condition of the variance, the Township has a legal remedy by injunction or rescission of the variance.

ALITO, Circuit Judge, dissenting:

I respectfully dissent for two reasons. First, unlike the majority, I do not think that the decision of the Board of Adjustment ("BOA") denying the variance was arbitrary or capricious. Second, I do not believe that the Bankruptcy Court's Opinion vacating the condition that the BOA ultimately chose to apply -- the hiring of of f-duty police officers -- is properly before us for review.

I.

The New Jersey Legislature has delegated the power to grant or deny variances to local boards of adjustment. See N.J. Stat. S 40:55D-70. However, the Legislature has restricted that power in the following manner:

> No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance.

N.J. Stat. S 40:55D-70(d) (2000).

In other words, a board must deny a variance if it finds either that the variance would ultimately result in a "substantial detriment to the public good" or that the variance would "substantially impair the intent and purpose of the zone plan and zoning ordinance." In this case, the BOA unanimously found that denial of BAPS's application was mandated by the parking and traffic problems that granting the variance would cause. P.A. 451.

"Review of the decision of a board of adjustment . . . begins with the recognition that the boar d's decision is presumptively valid and is reversible only if arbitrary, capricious, and unreasonable. Underlying the pr esumption is the recognition that such boards possess special knowledge of local conditions and must be accor ded wide latitude in the exercise of their discr etion." Sica v. Bd. Of Adjustment, 127 N.J. 152, 166-67, 603 A.2d 30, 37-38 (1992) (citations omitted). "[A] reviewing court [may not]

11

`suggest a decision that may be better than the one made by the . . . planning board,' we merely`determine whether the board could reasonably have reached its decision.' " Pullen v. Township of S. Plainfield Planning Bd., 291 N.J. Super. 1, 6-7, 676 A.2d 1095, 1097 (App. Div. 1996) (quoting Davis Enters. v. Karpf, 105 N.J. 476, 485, 523 A.2d 137, 141 (1987)). Moreover, the bur den on a party is even greater when challenging the denial of a variance than when challenging the approval of a variance. See Nynex Mobile Communications Co. v. Hazlet Township Zoning Bd. of Adjustment, 276 N.J. Super. 598, 609, 648 A.2d 724, 730 (App. Div. 1994) (citing Cerdel Constr . Co. v. Township Comm., 430 A.2d 925 (1981)). "Thus, an applicant bears a heavy burden in overcoming a denial." Id.

The majority rejects the BOA's two main r easons for denying the variance--a shortage of parking and traffic problems--holding that "[t]he r ecord shows little support for . . . these concerns." Maj. at 8. The record, however, contains more than sufficient evidence for the BOA's decision to withstand review.

BAPS does not contend that it was inappropriate for the BOA to consider parking and traffic problems in making its decision on the variance. See Price Co. v. Zoning Bd. of Adjustment, 297 N.J. Super. 327, 331-32, 652 A.2d 784, 787 (Law. Div. 1993). Nor does BAPS contend that the BOA acted unreasonably in refusing to grant its application for a variance as it was initially presented to the BOA. Rather, BAPS challenges the BOA's refusal to accept its proposal to limit occupancy to 505 people as a solution to the detrimental effects of the proposed temple--a temple still capable of accommodating 1500-1600 people.1 P.A. 253.

_____

1. Notably, while BAPS proposed to limit the occupants to 505 people and to rearrange the interior of the temple so that the prayer hall would be suitable for 505 people, BAPS never offer ed to reduce the overall square-footage of the temple, which would still remain capable of holding 1500-1600 people. The majority apparently holds that the BOA's decision to focus on the gross square footage of the temple rather than on the square footage of the prayer hall alone was arbitrary and capricious. I find no support for the conclusion that no reasonable person could focus on the gross capacity of the temple.

Under the Sica test, the BOA was first r equired to "reduce the detrimental effect [of granting the proposed variance] by imposing reasonable conditions on the use . . . . [and] then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." Sica, 127 N.J. at 166, 603 A.2d at 37. The BOA r ejected the proposed occupancy limit as an invalid "r easonable condition on the use" for three reasons. The BOA determined (1) that the proposed conditions did not sufficiently eliminate the parking and traffic problems; (2) that BAPS would be unable to impose the proposed conditions effectively; and (3) that BAPS would be unlikely to adhere to the proposed conditions. Each of these reasons is supported by substantial evidence and thus pr ovides an adequate basis for the BOA's denial of the variance.

i.

First, the BOA reasonably found that, even with the occupancy limit of 505, the proposed BAPS temple would cause a substantial detriment to the public good with respect to parking and traffic. See Price Co. v. Zoning Bd. of Adjustment, 279 N.J. Super. 327, 328–29, 652 A.2d 784, 785 (Super Ct. 1993).

Testifying about parking, the BAPS expert, Michael Maris, and the BOA's expert, Hal Simoff,[2] agreed that the temple would need one parking space for approximately every 3.3 occupants. P.A. 131; 264. Thus, the temple would need 153 spaces to accommodate 505 people. The parking lot that the proposed temple site shares with a T aco Bell has a total of 193 spaces. Therefore, if Taco Bell owns only 27 spaces, as BAPS contends, there was enough parking for 505 people; conversely, if Taco Bell owns 64 spaces, as the BOA contends, then enough parking does not exist.

The only testimony as to the number of parking spaces that Taco Bell owns came from Simof f, who opined, based

_____

2. The BOA hired Simoff to study the parking and traffic effects of the proposed temple and to make an independent r ecommendation on whether the variance should be granted.

13

on his examination of the Taco Bell lease and his measurements of the property, that T aco Bell owns 64 spaces. P.A. 261-62. BAPS's figure of 27 spaces is based entirely on the testimony of Town Planner Michael Kauker, who stated that Taco Bell "could use 27 spaces" -- which meant that the zoning laws would be satisfied if T aco Bell had a minimum of 27 spaces. P.A. 11-12. This fact has little logical relationship to the number of spaces that Taco Bell owns and thus does not undermine Simof f 's testimony.

The majority dismisses Simoff 's testimony on this point partly because he is not a lawyer and because T aco Bell has "not appeared to defend its right to a certain number of parking spaces." Maj. at 9 fn.5. Simof f 's lack of a law degree was a fact that the BOA could have considered in assessing the weight to assign to his opinion, but this fact did not make it unreasonable for the BOA to accept his testimony. Moreover, I fail to see the significance for present purposes of Taco Bell's failure to appear in the federal court proceedings. Taco Bell is not bound by the decision in this case, and it is not difficult to think of business reasons why it might have chosen not to appear.

As for traffic, Simoff and Maris disagr eed over the ability of Route 1 & 9, a state highway, to absorb the traffic that the temple would generate. The BOA President r easonably worried that Route 1 & 9 "is a heavily trafficked road . . . . It will be a mess. [Cars] will be lined up on[Route 1 & 9], trying to get in.". P.A. 447. Another BOA member noted that when discussing "[Route] 1 & 9, you'r e talking a state highway. It's treacherous. Exiting and entering anywhere on [Route 1 & 9] for one car, you'r e taking your life in your hands." P.A. 448-49.

The BOA heard conflicting expert testimony on the impact that the proposed temple would have on traffic. Simoff testified that the traffic volume along Route 1 & 9 at the temple site during peak midday hours was 1600 vehicles/hour. P.A. 228. He further testified that the temple would generate 168 vehicles/hour exiting during peak time. P.A. 231. According to Simoff 's computer modeling, under these conditions, Route 1 & 9 at the temple driveway would

14

operate at Level of Service F.3  P.A. 236. Simoff characterized this level of service as "unacceptable under any conditions." P.A. 237.

Maris agreed that Level of Service F is unacceptable, but he testified that, with the temple, the Level of Service would be "C" -- a negative impact of only one service level from its current service level of "B." P.A. 144-45. Maris characterized this as "an acceptable impact on traffic." P.A. 145.

The majority holds that it was unreasonable for the BOA to accept Simoff 's testimony because, on cross-examination, Simoff admitting making a minor error in calculation. The main difference between Simoff 's conclusion and Maris's came from their use of different "peak hour factors"4 -- Simoff testified that he used a peak hour factor of .7 in his calculations, P.A. 292, while Maris testified that he used a peak hour factor of .91. P.A. 148. Simoff admitted on cross-examination that the correct peak hour factor was .82--barely closer to that used by Maris than to that used by Simoff. P.A. 293-94. Nevertheless, using the correct peak hour factor, Simoff calculated the entryway would still be classified as Level of Service D. P.A. 294.

Weighing witness credibility is the pr ovince of the BOA,5 and the BOA was entitled to accept Simoff 's opinion despite his initial error. Simof f admitted that neither he nor

---

3. Planners refer to "Levels of Service" when measuring the traffic flow of a road and its corresponding ability to accept traffic entering from a driveway or connecting roadway. Level of Service A means that the average delay for a vehicle waiting to enter is less than 10 seconds per vehicle, and Level of Service F means that the delay is greater than 50 seconds per vehicle. P.A. 144-45; 236-37.

4. The "peak hour factor" is a factor used in the calculation of a road's level of service. The peak hour factor compensates for the fact that cars will not attempt to exit a driveway uniformly throughout the peak hour. P.A. 149.

5. See Beverly Calif. Corp. v. NLRB, 227 F.3d 817, 830 (7th Cir. 2000); Hambsch v. Department of the Treasury , 796 F.2d 430, 436 (D.C. Cir. 1986); Baghdikian v. Bd. of Adjustment, 247 N.J. Super 45, 48-49, 588 A.2d 846, 848 (App. Div. 1991).

Maris used the correct peak hour factor in their application, and that the real peak hour factor lay somewhere in between, only slightly closer to Maris's number than to his own. Moreover, the error would not have changed his ultimate conclusion. Lastly, the error in calculation related only to the ability of cars to exit the proposed temple's parking lot, leaving unaffected any conclusions about the capacity of the parking lot or the ability of cars to enter the parking lot. Under these circumstances, Simoff may have been slightly "discredited," as the majority claims, but I do not believe that it was unreasonable for the BOA to accept any of Simoff's testimony, as the majority effectively holds. See Todd v. Sheridan, 268 N.J. Super. 387, 400, 633 A.2d 1009, 1016 (App. Div. 1993) ("The finder of fact is free to accept all, some, or none of an expert witness's opinion."). Moreover, accepting Simoff's revised testimony, I do not believe that the Board unreasonably decided that a decrease from Level of Service B to Level of Service D constituted a substantial detriment to the public good.

ii.

Second, the BOA reasonably questioned whether BAPS could adhere to the proposed restriction. The BOA President worried that "it would not be feasible to tell a person that he or she could not attend services." P.A. 448. This concern is neither arbitrary nor capricious. Under Sica, the BOA is required to consider only "reasonable conditions." Sica, 127 N.J. at 166, 603 A.2d at 37. A condition that is not feasible certainly does not qualify as a reasonable condition.

The majority does not address the specifics of how BAPS will prevent more than 505 people from attempting to come to services. If the number of cars coming to the temple site exceeds the number of parking spaces, it is predictable that some people who wish to attend services and who know that there is space for them in the temple will park their cars illegally on adjoining streets and then walk to the temple. This would create a very dangerous situation. P.A. 227-28.

16

Simoff recommended that the variance be granted if BAPS would reduce the square footage of the temple to a size suitable for an occupancy of approximately 450 people. P.A. 299 & 398-400. However, none of BAPS's proposals show a willingness to reduce the size of the temple. Thus, even if enough parking existed on the site for an occupancy limit of 505, it was not unreasonable for the BOA to reject the limitation of occupancy as not being a "r easonable condition."

iii.

Third, the BOA reasonably questioned whether BAPS would adhere to the proposed restriction. The BOA President doubted whether BAPS "would voluntarily limit its membership." P.A. 448. It was r easonable for the BOA to question whether BAPS would be willing to tur n people away at the door once 505 people had entered the temple, even though there would still be room for 995 to 1095 attendees.

In questioning BAPS's willingness to do this, the BOA only partially relied on Simoff 's testimony regarding the alleged over-occupancy of BAPS's temple in Edison. The BOA President made the common-sense comment that "I, for one, do not believe that any organization would voluntarily limit its membership." P.A. 447. In other words, he doubted BAPS's willingness to turn away people who wished to enter the temple to worship even though there was plenty of room for them inside. This view was well within the bounds of reason.

The majority questions the BOA's sincerity because the BOA previously granted a variance for the operation of a nightclub on the same property. Maj. at 9. However, as far as I am aware, BAPS itself has never questioned the BOA's motives. I would view this case quite differ ently if there were any suggestion that the BOA harbor ed any bias towards BAPS or its members, but I am awar e of no such evidence. Furthermore, the parking and traffic concerns associated with a nightclub can be very differ ent from those associated with a house of worship. The temple's main services would be on Sunday, with other services on

17

weekday afternoons. See P.A. 177–78 (BAPS's schedule of services). A nightclub would normally draw patrons only late at night, when parking may be more available and traffic flow is lighter. Also, it is likely that the arrival and departure of patrons of a nightclub would be more evenly spaced over its hours of operation, whereas the proposed BAPS temple could generate mass entry and exodus at specific times. In any event, we do not have befor e us the record concerning the BOA's pr evious grant of a variance, making it impossible to draw conclusions as to pr opriety of an analogy between the nightclub and the proposed temple.6

II.

I also note that the BOA's later decision to impose the condition of hiring off-duty police officers at BAPS's expense to monitor traffic is not properly befor e us. The BOA imposed the condition on December 1, 1999, a week after filing the notice of appeal to the District Court in this case. The Bankruptcy Court subsequently vacated the condition on January 7, 2000. The BOA has not appealed that decision, nor does it raise the issue in its brief. See Brief of Appellant at 14 (disavowing a challenge to the Bankruptcy Court's order vacating the condition). Indeed, the majority's conclusion that there is nothing in the r ecord to support the condition is self-evident, since the Boar d was ordered by the Bankruptcy Court to begin considering r easonable conditions on November 29, 1999, whereas we have no record before us concerning any BOA actions or meetings occurring after October 9, 1999.

_____

6. The Majority implies that it was per se unr easonable for the Board to rely upon common knowledge as well as its weighing of the credibility of the BAPS petitioners to reach the conclusion that BAPS would probably not adhere to the occupancy limit. Maj. at 9 n.7. If this were the case, then it would form the basis for a blanket rule that, no matter how preposterously low the proposed occupancy limit was when compared to the designs of and intended use for the building, a Board of Assessment must accept a petitioners proposed occupancy limit. This cannot be the case.

18

III.

In sum, the majority disregards the long-standing proposition that "[a]n abuse of discr etion does not exist simply because we disagree with the [finder of fact's] decision." Barnes Foundation v. T ownship of Lower Merion, 242 F.3d 151, 167 (3d Cir. 2001) (Nygaard, J., dissenting). " `Abuse' itself is a serious accusation and in using the term `abuse' to define our standard of r eview, our jurisprudence has recognized the institutional superiority of the [finder of fact]. Therefore, we should not r eadily discard its findings and conclusions." Id.

Because I believe that the BOA's decision is supported by substantial evidence and is not arbitrary or capricious, I would reverse the decision of the District Court and sustain that of the BOA.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

19