984 A.2d 460 (2009)
410 N.J. Super. 108
Andrew FAUCETT, Plaintiff-Respondent,
v.
Darianna VASQUEZ, Defendant-Appellant.
No. A-2945-08T1.
Superior Court of New Jersey, Appellate Division.
Argued September 15, 2009.
Decided December 17, 2009.
*461 Jonathan D. Gordon argued, Teaneck, the cause for appellant (Law Offices of Jonathan D. Gordon, LLC, attorneys; Mr. Gordon and Jennifer M. Cornelius, on the briefs).
Corrin M. DeMent, Woodbury, argued the cause for respondent (Hoffman DiMuzio, attorneys; Ms. DeMent, on the brief).
Before Judges GRALL, MESSANO and LeWINN.
The opinion of the court was delivered by
MESSANO, J.A.D.
This case presents a question of first impression in this State. In particular, must a parent seeking modification of a court order regarding custody of her child bear the threshold burden of establishing "changed circumstances that affect the welfare of the child[,]" Hand v. Hand, 391 N.J.Super. 102, 105, 917 A.2d 269 (App. Div.2007), when the court-ordered parent of primary residence (PPR) is a member of the United States military about to be deployed for a year away from home? We conclude that the moving party is not entitled to a parental presumption that modification is warranted solely because of the PPR's military deployment. However, we also conclude that once an otherwise fit parent demonstrates that the PPR is facing deployment for a significant period of time, in our view, one year or more, she has demonstrated a prima facie case and is entitled to a plenary hearing as to disputed material facts regarding the child's best interests, and whether those best interests are served by modification of the existing custody order.
We therefore reverse the order under review to the extent that it dismissed defendant's motion without prejudice, and remand the matter to the trial court for further proceedings consistent with this opinion.

I.
Plaintiff and defendant were married on January 11, 1997, and divorced on December *462 11, 2001. Their union produced a son, Billy, who was born in 1997.[1] Plaintiff's subsequent application in 2002 to settle disputes over custody, parenting time and support resulted in an order setting the matter down for trial. While it is unclear whether a plenary hearing was conducted on all issues, the court entered a subsequent order, dated July 26, 2002 (the 2002 order), that provided in pertinent part: 1) "joint legal custody" would continue; 2) plaintiff would be the PPR "except [defendant would] be the [PPR] ... during school summer vacations"; 3) "[d]uring school summer vacations ... [defendant would] have custody ... approximately 70% of the summer vacation and [plaintiff] approximately 30% of the time"; and 4) defendant would have "the child for [three] weekends each month as determined by the parties...."
Plaintiff subsequently agreed to vacate defendant's child support obligations; in January 2008, however, he moved to reinstate them and sought reduction of defendant's parenting time as provided by the 2002 order. He also asked the court to prohibit "any and all discussions with the minor ... pertaining to a change in primary residence."
Defendant opposed the motion and cross-moved seeking modification of the 2002 order herself. In general, she alleged that plaintiff had failed to comply with provisions that required counseling sessions for the entire family; that plaintiff was not sharing parenting information with her; and that plaintiff had adopted a "military approach to childrearing," which included corporal punishment. As a result, she claimed Billy had become fearful and anxious. Defendant also claimed that her son's medical needs were neglected. She sought a temporary transfer of custody while further information was gathered through a risk assessment and psychological evaluation of her son.
The motion judge entered an order on February 1, 2008 that thoroughly addressed all the issues presented by both sides. He refused to reduce defendant's parenting time because plaintiff "ha[d] not pointed to any change in circumstances that would warrant a change ...." He ordered both parties not to "discuss the litigation with the child."
The judge also denied defendant's motion to be designated PPR "without prejudice." He noted that the issue essentially involved "parenting time," and must be referred, in the first instance, to mediation. See R. 5:8-1. As a result, he ordered both parties to "participate in mediation to attempt to resolve their current dispute over custody and parenting time." Failing resolution, both parties were ordered to participate in a "Custody Neutral Assessment" (CNA), the costs of which were to be shared equally. The judge permitted either side to "file an appropriate motion" if the matter was thereafter still unresolved. Significantly, the judge determined that "[d]efendant ha[d] not established a sufficient reason to transfer custody on a motion." Lastly, the judge granted defendant's request "to arrange for counseling sessions for the child...."
The CNA was completed on August 28, 2008 by Robert B. Haynes, Ph.D. Haynes interviewed plaintiff, who was employed by the Army, had now re-married for a third time, and lived in Burlington County with his new wife, Billy, and two stepsons. Plaintiff reported no major problems with Billy's health, no behavioral problems, and no educational problems, with the exception of Billy's poor grades in mathematics, his son's "most troubling subject." Billy *463 had been in the same school system since kindergarten, and plaintiff arranged for tutoring and enrollment in "an early intervention program...." Plaintiff denied any excessive discipline or corporal punishment directed toward his son.
Haynes noted that routinely Billy would be alone when he returned home from school, but plaintiff reported that someone would arrive shortly thereafter. On one occasion, plaintiff recounted that the Division of Youth and Family Services "was contacted regarding [Billy] being left alone after school." The matter was investigated, and "dropped without incident."
Haynes interviewed defendant. At that time, she resided in a two-family home in Bergen County, approximately two hours from plaintiff, with her mother, brother and six-year old son from another relationship. She too reported that Billy suffered from no significant behavioral or health problems, but claimed he was a "`horrible student.'" Defendant felt it was inappropriate for Billy "to be home by himself after school for any length of time." She wanted the judge to decide "whether [Billy's] being home alone [wa]s permissible."
Lastly, Haynes interviewed Billy, who told him that his parents' divorce "ha[d] been tough on him." He liked his father's new wife who "encourage[d]" him to be artistically creative, and "stated that both parents ha[d] qualities that he like[d]." The child genuinely appreciated both of his parents. Nonetheless, Haynes opined that Billy "seemed sad," and expressed a desire to "`be more popular'" during the upcoming school year.
Haynes recommended that Billy receive counseling, and he urged the parties to "open[] up ... for appropriate, child-focused communication ... for [Billy's] sake." Expressing concern for Billy's "grades in school[,]" Haynes believed the early intervention program and private tutoring were "crucial for [Billy's] success." He noted that it was "more difficult to change school systems after the school year" began. Haynes made no other specific recommendations, finding that "both parents love their son and desire[d] to have him reside with them ...." He believed that "neither parent [wa]s trying to alienate their son from the other."
In January 2009, defendant sought, by order to show cause, the immediate transfer of custody because of plaintiff's impending deployment as a military reservist, initially out of state, but thereafter, overseas.[2] The same judge that had considered the prior motion and cross-motion denied the application, finding no "probability of immediate and irreparable harm...." In a short written statement of his reasons, the judge noted that "plaintiff's upcoming deployment ... [wa]s not a sudden development" and "was known to the parties well in advance." He further noted that Billy was "currently enrolled in school," and that defendant had made "no showing that the child w[ould] be harmed in any way if, pending the filing of a motion, the child continue[d] to live with plaintiff's spouse in the same house he ha[d] been living in." The judge also noted that "defendant's contention that this deployment will immediately and adversely affect [Billy] w[ould] need further development, most likely with the benefit of a custody expert analysis."[3]
Defendant immediately moved to modify custody and parenting time, and also *464 sought child support if she was awarded custody of Billy. Noting that "[t]here [wa]s not much more to say ... since last February," i.e., the denial of her prior cross-motion, defendant characterized the reason for her current application as "simple." She certified that plaintiff had recently informed her that he was about to be "deployed in Iraq for a year[,]" that he was leaving at the end of January, and that "he expected his wife to care for [Billy] and ... have primary residential custody." Defendant claimed Billy "should ... live with [her] in the absence of his father."
Defendant reiterated her ability to care for Billy. She noted that plaintiff's wife, who was also in the military, sometimes had to leave home during the work week, resulting in all three children being left in the care of plaintiff's parents. Defendant argued that she provided "the preferred living arrangement for [Billy] in his father's absence[,]" and suggested that upon plaintiff's return from service, the parties "c[ould] re-evaluate the child's needs...."
Defendant further claimed that if Billy did not live with her during plaintiff's absence, "it would negatively impact him emotionally," though she provided no details or support for that conclusion. She stated that she was "open to reasonable visitation arrangements" so her son could "continue to see his step-family and his paternal family." In sum, defendant sought "full residential custody of [Billy]" while plaintiff was deployed overseas, along with reasonable child support.
Plaintiff opposed the motion. He noted that he would be deployed in February 2009 "for one year or less." He claimed that Billy was "extremely close" to his step-siblings, and all three children "live[d] and play[ed] together well." Before being deployed to Iraq, plaintiff was to spend the first three months of his active duty in the United States. He noted that he would be accorded one extended leave which would permit him to return home and see his son. He also explained that while stationed in Iraq, it would be difficult to contact home, and it would be even more difficult if he had to contact defendant to speak to his son. Plaintiff took the opportunity to add that defendant's house was a "mess," that several people lived with her, and that Billy "often ... d[id] not have a place to sleep" when he stayed with her. Plaintiff agreed to "allow extra [parenting] time for... defendant" while he was deployed.
In a reply certification, defendant alleged that plaintiff's wife "strongly believe[d] that [Billy] should move in" with defendant while plaintiff was deployed. Defendant also alleged that plaintiff's wife told her that the couple was experiencing "severe marital problems," and that plaintiff's parents were behind the opposition to any change in custody. She denied the allegations plaintiff made about the condition of her home and her care of Billy.
The same judge considered oral argument on the motion on February 13, 2009, and entered his order, along with a comprehensive written opinion, the same day. After reviewing the parties' contentions, he first noted that plaintiff was on active military duty, and thus was entitled to the protections afforded by N.J.S.A. 38:23C-4. The judge noted, however, that while that statute provided that "no judgment or final order" shall be entered against a litigant while on active military duty, he did not intend to enter a final order in the matter.[4]
*465 The judge concluded that "there [wa]s no need [for] a change of custody [to] immediately occur." He noted that Billy was in the "same school ... he ha[d] always attended[,]" was near his friends, and was having his medical needs met. The child "did not report any problems with the care provided by plaintiff's wife."
The judge also found that defendant did not view the change in custody request as "`temporary,'" but rather suggested that the issue should be revisited when plaintiff returned from active duty. He noted that Billy was not residing with "a distant family member or friend" while his father was away, but rather would be in an "intact family unit" of which he had been a part since 2002.[5] The judge also considered the fact that a change in residential custody would disrupt Billy's school year which was more than half completed.
In conclusion, the judge found that there was "no competent evidence produced by defendant that the child w[ould] not be well-cared for by plaintiff's spouse. There [wa]s no evidence that the child's best interests w[ould] be served ... by an abrupt change of custody." The judge further rejected defendant's assertion that "a child should always be with a biological parent[,]" noting that "`rule'" could not be applied where a child was in the middle of the school year in a stable home. He denied defendant's motion for an immediate change of custody "without prejudice."
However, the judge decided to increase defendant's parenting time to every weekend and all school holidays. He increased defendant's summer parenting time, ordering Billy to reside with her all summer, except for two weekends each month. The judge also ordered a "custody evaluation" after which he anticipated either party could apply again for modification of his order. This appeal ensued.

II.
Defendant contends that it was "an error of law and an abuse of discretion for" the judge to refuse to modify the 2002 order and award her residential custody of Billy while plaintiff was deployed. Ancillary to this core argument, she contends that the judge speculated regarding the impact plaintiff's deployment would have upon Billy instead of relying upon expert opinion; improperly granted a preference to a third-party instead of the child's biological mother; and improperly designated the child's stepmother as the primary caregiver by proxy for plaintiff.
Plaintiff contends that defendant failed to establish a prima facie case for modification of the 2002 order, and that the judge's decision in this regard is entitled to our significant deference.

A.
We begin by stating some first principles that guide our review. The touchstone for all custody determinations has always been "the best interest[s] of the child." Kinsella v. Kinsella, 150 N.J. 276, 317, 696 A.2d 556 (1997). "Custody issues are resolved using a best interests analysis that gives weight to the factors set forth in N.J.S.A. 9:2-4(c)." Hand, supra, 391 N.J.Super. at 105, 917 A.2d 269. That statute permits a judge to make "[a]ny ... custody arrangement ... in the best interests *466 of the child." N.J.S.A. 9:2-4(c). The statute requires a judge to consider and weigh a myriad of factors before making any custodial determination:
In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.
[Ibid.]
Absent exigent circumstances, changes in custody should not be ordered without a full plenary hearing. R. 5:8-6; Entress v. Entress, 376 N.J.Super. 125, 133, 869 A.2d 451 (App.Div.2005). That is so because, as we have noted in another context, even "a temporary decision to change custody can take on a life of its own, creating a new status quo." Peregoy v. Peregoy, 358 N.J.Super. 179, 203, 817 A.2d 381 (App. Div.2003). The status quo ante is significant because "[a] party seeking to modify custody must demonstrate changed circumstances that affect the welfare of the child[]." Hand, supra, 391 N.J.Super. at 105, 917 A.2d 269; Beck v. Beck, 86 N.J. 480, 496 n. 8, 432 A.2d 63 (1981); see Todd v. Sheridan, 268 N.J.Super. 387, 398, 633 A.2d 1009 (App.Div.1993) (holding that a moving party must demonstrate "changed circumstances which would have an impact on the child's welfare").
There exists, however, an equally weighty set of first principles that defendant is quick to bring to our attention. Our courts have recognized that "a legal parent has a fundamental right to the care, custody and nurturance of his or her child." V.C. v. M.J.B., 163 N.J. 200, 218, 748 A.2d 539 (2000) (citing Watkins v. Nelson, 163 N.J. 235, 245, 748 A.2d 558 (2000)), cert. denied, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000); Matter of D.T., 200 N.J.Super. 171, 176, 491 A.2d 7 (App.Div.1985). N.J.S.A. 9:2-4 specifically provides that "[i]n any proceeding involving the custody of a minor child, the rights of both parents shall be equal ...." As a result, "the concept that a presumption of custody exists in favor of a parent, and that only a showing of unfitness, abandonment, gross misconduct, or `exceptional circumstances' will overcome this presumption, is steeped in the history and common law of this State." Watkins, supra, 163 N.J. at 246, 748 A.2d 558.
Thus, "when the dispute is between a fit parent and a third party, only the fit parent is presumed to be entitled to custody." Id. at 253, 748 A.2d 558. "[T]he child's best interest is advanced by not awarding custody to the parent" only if the presumption is rebutted by "application of the parental termination standard or a finding of `exceptional circumstances[,]'" ibid., such as "the third party ha[ving] become a psychological parent" to the child. Id. at 254, 748 A.2d 558. As a result, "the best interest of the child cannot validly ground an award of custody to *467 a third party over the objection of a fit parent without an initial court finding that the standard for termination of the rights of a non-consenting parent or the `exceptional circumstances' prong has been satisfied." Id. at 255, 748 A.2d 558.
We now consider these basic principles and their application to the facts of this case.

B.
Defendant's argument may be distilled to an essential point. In seeking modification of the 2002 order, she need not demonstrate a change of circumstances that affect Billy's welfare, because, as between herself and plaintiff's current wife, defendant is presumed to be entitled to custody of her son. Since plaintiff did not rebut this presumption by demonstrating defendant was unfit, or that "exceptional circumstances" existed, the judge erred in not awarding her immediate residential custody of Billy while plaintiff was deployed on active military duty.
Plaintiff's retort is that the dispute is not between defendant and a third-party, but, rather between two natural parents. Since he is the PPR, defendant bore the burden of demonstrating changed circumstances that affected Billy's welfare such that modification was warranted. Plaintiff contends defendant failed to do this, and the judge correctly determined not to alter the status quo.
We recognize that defendant's argument is intuitively appealing. As a fit parent who has exercised significant and regular parenting time with her son, why should she not be granted immediate residential custody of Billy while his father is deployed overseas? However, a careful examination of the facts presented in Watkins serves to readily distinguish it from this matter. As a result, we reject defendant's argument that seeks to rigidly apply a presumption in her favor.
In Watkins, supra, the Court was called upon to decide the appropriate standard to apply in a custody dispute between a child's father, the plaintiff, and her maternal grandparents, the defendants. 163 N.J. at 237, 748 A.2d 558. The child's mother had died shortly after giving birth, and the child had thereafter been raised by the defendants. Ibid. The defendants refused the father's request for custody and filed an action pursuant to N.J.S.A. 9:2-5 seeking an order granting them custody of their granddaughter.[6]Id. at 238, 748 A.2d 558. The Court noted that even upon the death of the custodial parent, the statute "precludes the surviving non-custodial parent's automatic accession to custody of his or her child ...." Id. at 243, 748 A.2d 558. Instead, the Family Part is empowered to consider the custody issue during "the time period between the death of the custodial parent and the ultimate transfer of custody." Ibid.
*468 In such disputes, the Court enunciated the analytic framework as follows:
[I]t is the relationship of the child to the person seeking custody that determines the standard to be used in deciding the custody dispute. When the dispute is between two fit parents, the best interest of the child standard controls because both parents are presumed to be equally entitled to custody. The child's best interest rebuts the presumption in favor of one of the fit parents. But, when the dispute is between a fit parent and a third party, only the fit parent is presumed to be entitled to custody. In that context, the child's welfare is protected because the presumption in favor of the fit parent is rebuttable. Once the presumption in favor of a fit parent is rebutted ..., the child's best interest is advanced by not awarding custody to the parent. Viewed in that context, in custody determinations between a fit parent and a third party, ... the child's best interests become a factor only after the parental termination standard has been met, rather than the determinative standard itself.
[Id. at 253, 748 A.2d 558.]
The Court announced this paradigm, however, in a factual context far different from the one presented here. In Watkins, the custodial parent had died. Therefore, an ultimate decision had to be made as between third-parties with de facto custody who were now seeking court approval, and a natural parent opposing their attempts and seeking custody himself.
In this case, plaintiff's current wife, who defendant argues is the analogous third-party in the Watkins framework, is not seeking custody of Billy. In our view, this distinction is critical. Unlike the father in Watkins who faced the denial of custody and a significant curtailment of his parental rights, defendant in this case faces no such consequences. Indeed, she continues to share legal custody of Billy with plaintiff, and the judge significantly increased her parenting time.
There are other reasons why the parental presumption ought not to apply when the PPR is facing temporary military deployment. In Watkins, the custodial parent's death created an unalterable set of circumstances. The child in that case could never be reunited with the parent who previously had exercised primary, albeit short-lived, custody. That is clearly not the case here. Instead, plaintiff will hopefully return from his deployment in good health and in a relatively short, finite period of time, after which he can resume his relationship with Billy as before.
Lastly, in Watkins, neither the deceased mother nor the plaintiff/father had ever sought a court order defining their custodial relationship with their child. As a result, the Court was affirming the basic tenet that as between a third-party and a natural parent, the parent need not bear the initial burden of proving that it was in the child's best interests to award him custody because he provided a better home than that provided by the interested third-party. See Watkins, supra, 163 N.J. at 252, 748 A.2d 558 (discussing the desire to "reduce or minimize judicial opportunity to engage in social engineering" by not turning every custody conflict "into a `fitness contest'").
In this case, however, the 2002 order defined the custodial relationship between Billy's parents, and it resulted from both parties submitting their initial dispute to the jurisdiction of the Family Part for resolution. As we have noted, "[a] judgment, whether reached by consent or adjudication, embodies a best interests determination." Todd, supra, 268 N.J.Super. at *469 398, 633 A.2d 1009. Moreover, as the Court has noted in other contexts,
[W]hen ... both parents have a fundamental right to the care and nurturing of their children and neither has a preeminent right over the other, their contest stands on different footing. It is not a third party or the State that seeks to intrude into the protected sphere of family autonomy. Rather, by submitting their dispute to the court, it is the parties themselves who essentially seek the impairment of each other's rights. In that circumstance, the State is thrust into the role of "mediator by necessity."
Indeed, by seeking a divorce and invoking the jurisdiction of the Family Part, each party assented to the possibility that there will be some curtailment of what would otherwise be the ordinary rights concomitant to parenthood. For example, a party may be denied custody. Visitation may be circumscribed. Vacations may be shared or lost. One parent may be granted the right to move away with the child. All such orders impair to some extent one of the parties' parental rights, and the party participants are deemed to have consented to the possibility of such impairment when they submit their disagreement to a court....
In such cases, the sole benchmark is the best interests of the child. [Sacharow v. Sacharow, 177 N.J. 62, 79-80, 826 A.2d 710 (2003) (citations omitted).]
We might assume that the difficult questions posed by this appeal are being raised in courtrooms throughout the United States, and that decisional law from our sister jurisdictions could provide us with guidance. However, no reported decision was brought to our attention by either party, and our own independent research has disclosed few that discuss the issues in this context. However, those reported cases support our conclusion that the parental presumption does not apply to this dispute.
In one case, a father facing a second deployment to Iraq as an Air Force reservist sought modification of the existing parenting plan previously incorporated in the parties' divorce decree. In re Marriage of DePalma, 176 P.3d 829, 831 (Colo. App.2007), cert. denied, 2008 WL 434613, 2008 Colo. LEXIS 149 (Colo. Feb. 19, 2008). He sought an increase of his parenting time so as "to allow the children to spend equal time with each parent." Ibid. Additionally, he "requested that the parenting time schedule remain in effect when he was stationed in Iraq." Ibid. The father asserted that his children's best interests would be served by having his new wife exercise his parenting time because bonds had been created between the children, their stepmother, and her son. Ibid. In opposing the motion, the mother contended that it was an attempt to "impermissibly... establish parental rights for [the husband's] new wife that [she] could not have obtained in her own right, and that [the] mother should not be required to decrease her parenting time in favor of a nonparent." Ibid. After conducting two plenary hearings, the trial "court ordered that the children should be in the care of [the] stepmother during [the] father's parenting time as he had requested." Ibid.
The mother appealed. Among other things, she argued "that the trial court erred in holding that [the] father could choose to delegate his parenting time to [the] stepmother while he is deployed or otherwise unavailable for extended periods of time[,]" and "that the court failed to accord her the presumptions to which she was entitled as the children's natural mother ...." Ibid. The appellate court first noted that "[i]n determining a custodial dispute between a parent and a nonparent, Colorado courts recognize a presumption *470 that a biological parent has a first and prior right to the custody of his or her child." Id. at 832 (citation omitted). However, the court noted that "[b]ecause the dispute was between mother and father, and not between mother and stepmother, the presumption that a parent has a `first and prior' right to the custody of his or her child was not implicated...." Ibid. Thus, "when two fit parents disagree, the court must weigh the wishes of both to determine what is in the child's best interests." Ibid. The appellate court then rejected the mother's contention "that the trial court effectively granted parenting time to [the] stepmother" or that it had "extend[ed] `special rights' to [the] stepmother[.]" Id. at 833. The court affirmed the lower court's order because it did "not perceive that it was an abuse of discretion to modify the plan to accommodate the best interests of the children." Id. at 835.
A case that provides less analysis of the issue is Lebo v. Lebo, 886 So.2d 491, 493 (La.Ct.App.2004). There, a post-judgment order named the plaintiff/father as the "domiciliary parent" of the parties' child and further set forth the terms of their custody arrangement. Id. at 492. Prior to his military deployment, the plaintiff executed a power of attorney in favor of his current wife, giving her authority to act on behalf of the child. Ibid. When the defendant/mother refused to return the child at the expiration of her parenting time, the stepmother "sought a civil warrant for the return of the child to her, which the [trial] court granted." Ibid.
On appeal, the mother argued that she should have "legal custody of the minor child ... since the [stepmother] could not have custody in preference to her...." Ibid. The Louisiana Court of Appeals rejected this argument, noting that as "domiciliary parent," the father had "the authority to make all decisions affecting the child unless otherwise provided in a custody implementation order." Ibid. The court continued that "a domiciliary parent's major decisions are presumed to be in the child's best interest, subject to review by the court upon motion of the other parent." Ibid. (citation omitted). Thus, "[the father] was acting within his authority in leaving his child in the care of his current wife." Ibid.
However, the court also noted that the father did not have authority "to unilaterally change custody of a minor child as [he] apparently attempted to do in his power of attorney." Id. at 492-93. It reversed the trial court's denial of the mother's motion for temporary custody, and remanded the matter for a hearing as to the child's best interests. Id. at 494.
Similarly, the Supreme Court of Kansas rejected application of the parental presumption to a custody dispute between a father, who was the custodial parent and about to be deployed to Korea for one year, and the children's mother, also in the military but soon to retire. In re Marriage of Rayman, 273 Kan. 996, 47 P.3d 413, 414 (2002). Noting the custody dispute was between two parents, the court determined "the parental preference doctrine [is] not applicable to the facts of [the] case." Id. at 416. Likening the facts presented to "temporary changes which relate to nonmilitary custodial relationships[,]" the court affirmed the trial court's decision denying the mother's modification request, and maintaining primary custody with the father during his absence.[7] Id. at 416-17.
*471 We are firmly convinced that the distinctions we have raised between the facts presented in Watkins and those presented here, and the limited jurisprudence from our sister states, require us to reject defendant's argument that the parental presumption applies to this dispute such that she was entitled to immediate residential custody of Billy solely because of plaintiff's military deployment. In this regard, we conclude the motion judge appropriately denied defendant's motion.

C.
Throughout the proceedings below, defendant's consistent position was that no hearing was required because she was presumptively entitled to residential custody of Billy. Thus, her motion never sought an investigation by the Family Division, Rule 5:8-1, an investigation by a neutral expert appointed by the court, Rule 5:3-3(e), additional discovery, or a plenary hearing. She simply sought an immediate change of residential custody based upon the parental presumption. To the extent defendant has not requested alternative relief from us, we could, perhaps, end our consideration of the issues presented at this point and affirm the motion judge's order.
However, we conclude that "our parens patriae responsibility to protect the welfare of children," Hand, supra, 391 N.J.Super. at 104, 917 A.2d 269, requires us to remand the matter, and for that reason, we need to address the following: if defendant is not presumptively entitled to immediate residential custody of Billy simply because of plaintiff's deployment, what standard should apply to her motion? Plaintiff contends that this situation is no different than any traditional custody dispute between two fit parents, and therefore requires analysis under the same framework. Plaintiff argues that his military deployment, standing alone, is insufficient to meet the burden of demonstrating changed circumstances that affect Billy's welfare. In part, he contends it would be "against public policy" to permit his deployment to "negatively affect [his] custody" rights because our military personnel would be "discouraged" from service as a result. He further contends that without "expert or evaluator opinion on the matter," the judge properly denied defendant's request.
The issue, however, is two-fold and sequential. Defendant must first make "a prima facie showing ... that a genuine issue of fact exists bearing upon a critical question such as the best interests of the child[] ...." Pfeiffer v. Ilson, 318 N.J.Super. 13, 14, 722 A.2d 966 (App.Div. 1999). Once a prima facie showing is made, defendant is entitled to a plenary hearing to resolve the disputed facts. Hand, supra, 391 N.J.Super. at 111, 917 A.2d 269.
A plenary hearing must be conducted where "the custody of children is a genuine and substantial issue...." R. 5:8-6. "[W]hen the submissions show there is a genuine and substantial factual dispute regarding the welfare of the children," the "plenary hearing is necessary to resolve the factual dispute." Hand, supra, 391 N.J.Super. at 105, 917 A.2d 269 (citing Shaw v. Shaw, 138 N.J.Super. 436, 440, 351 A.2d 374 (App.Div.1976)). Frequently, the factual disputes are evident based upon the conflicting certifications of the *472 parties, or based upon evaluative reports regarding the child's condition. See, e.g. Mackowski v. Mackowski, 317 N.J.Super. 8, 10, 721 A.2d 12 (App.Div.1998) (holding that certifications of parent and child regarding her desire to live with her father were sufficient to warrant a plenary hearing); Dorfman v. Dorfman, 315 N.J.Super. 511, 518, 719 A.2d 178 (App.Div.1998) (holding that a plenary hearing was necessary based upon mother's certification and school social worker's report of child's behavioral problems).
We agree that but for plaintiff's impending deployment, defendant's conclusory certifications would have been insufficient to warrant a plenary hearing. She herself admitted that little had changed since the February 2008 order that denied her prior request for modification of the 2002 order. However, we also conclude that defendant met her burden of demonstrating a prima facie change of circumstances that affected Billy's welfare based solely upon plaintiff's impending deployment. As a result, she was entitled to a plenary hearing to resolve any disputes of material fact remaining after the custody evaluation ordered by the judge was completed.
We are hard-pressed to see how defendant did not, in the first instance, establish that a significant change of circumstances in Billy's life was about to occur because of that plaintiff will be physically separated from Billy for twelve months, with very little contact in the interim.[8] He acknowledged in his certification that it would be difficult to contact his son. Thus, it is undisputed that plaintiff will not exercise traditional custody over Billy for a significant period of time. In this sense, the circumstances of Billy's day-to-day residential custody have clearly changed, albeit temporarily, since the entry of the 2002 order. See Sheehan v. Sheehan, 51 N.J.Super. 276, 288, 143 A.2d 874 (App. Div.) (recognizing court's obligation to examine the circumstances as they existed at the time the original order was entered), certif. denied, 28 N.J. 147, 145 A.2d 358 (1958).
Plaintiff's pending deployment for an entire year, in itself, was a circumstance of such magnitude, and likely to affect Billy's welfare, that defendant need not have awaited the passage of time and the consequences of plaintiff's absence vis-à-vis their son, to seek modification.[9] In *473 other words, if legal or residential custody is contested, a parent's military deployment and absence from the home for a significant period of time is sufficient for the Family Part to "order an investigation of the [situation]," in search of a "meaningful solution[] to serve the best interests of the child." Dorfman, supra, 315 N.J.Super. at 518, 719 A.2d 178. This is not to say that the non-deploying parent is necessarily entitled to modification; we only hold that defendant in this case established a prima facie case for modification and the matter should have been set down for a plenary hearing.
Undoubtedly, the judge agreed this was his obligation because he ordered a custody evaluation and denied defendant's motion without prejudice. Clearly, he viewed his decision as a temporary one based primarily upon the likely disruption caused to Billy if he was required to relocate in the middle of his school year.
We cannot discern why the judge chose to deny the motion without prejudice rather than setting a date for a future hearing after receipt of the custody evaluation. Denying the motion triggered defendant's right to appeal. In our view, this short-circuited not only the process that the judge anticipated would occurdefendant advised at oral argument no custody evaluation had taken placebut also the evaluative process that is required in these circumstances. As a result, we must reverse the order of dismissal and remand the matter for further proceedings.[10]

III.
Given the current state of our armed forces and the military commitments requiring the deployment and re-deployment of our nation's citizen-soldiers, the dilemma confronting divorced parents of young children as to how best advance the care of those children in the absence of one parent will undoubtedly recur.[11] Our nation's military presence in Iraq and Afghanistan has stirred several state legislatures into action.[12]
California, for example, now provides that "[a] party's absence ... shall not, by itself, be sufficient to justify a modification of a custody ... order if the reason for the absence ... is the party's activation to military service and deployment out of *474 state." Cal. Fam.Code § 3047 (West 2005). Arizona does not consider "military deployment of a custodial parent ... a change of circumstances that materially affects the welfare of the child if the custodial parent has filed a military family care plan ... and if the military deployment is less than six months." Ariz.Rev.Stat. Ann. § 25-411B (2009).[13] Kansas similarly permits the parties to enter into a parenting plan in contemplation of military deployment and provides a presumption "that the agreement is in the best interests of the child." Kan. Stat. Ann. § 60-1630(e) (2008).
Florida now provides:
If ... a motion for modification ... is filed because a parent is ... deployed... to military service and the parent's ability to comply ... is materially affected as a result, the court may not ... modify ... a previous ... order that changes time-sharing as it existed on the date the parent was ... deployed ... except that a court may enter a temporary order to ... amend ... if there is clear and convincing evidence that the temporary modification ... is in the best interests of the child....
If a temporary order is issued under this section, the court shall reinstate the time-sharing order previously in effect upon the servicemember parent's return from ... deployment....
[Fla. Stat. Ann. § 61.13002(1)-(2) (West 2008).]
See Mich. Comp. Laws Ann. § 722.27(1)(c) (West 2005) (permitting entry of temporary modification order while parent is on military duty if there exists "clear and convincing evidence" that modification is in the child's best interests and further providing for reinstatement of original custody order upon parent's return); Ky.Rev. Stat. § 403.340(5)(a) (West 2006) (providing that any modification order based upon military deployment shall be "temporary and shall revert back to the previous child custody decree at the end of the deployment")[14]; Ark.Code Ann. § 9-13-110(b)-(c) (2007) ("A court shall not permanently modify an order for child custody ... solely on the basis that one of the parents" is mobilized, but permitting "temporary modification" "consistent with the best interest of the child.").
Texas now accords either parent the opportunity to move for a "temporary" order if military deployment requires "moving a substantial distance" from the parent's residence "so as to materially affect [his] ability to exercise [his] rights and duties in relation to a child ...." Tex. Fam.Code Ann. § 153.702 (Vernon 2009). Such a temporary order "may grant rights to and impose duties on a designated person regarding the child," short of imposing child support obligations. Ibid. Any temporary order terminates when "military deployment ... is concluded," and then the "rights of all affected parties are governed by the terms of any court order" previously entered. Ibid. The Kansas statute places the burden of proof upon the "nondeploying parent" to show "that reentry of the custody ... order in effect prior to deployment ... is no longer in the best interests of the child" and also permits the court to "delegate" the deployed parent's rights to a family member "with a close and substantial relationship" to the child. Kan. Stat. § 60-1630(d), (f).
*475 Despite the significant implication potential overseas deployment of New Jersey's National Guard and reservists has upon the welfare of the State's children, our legislature has not yet acted.

IV.
In the absence of legislation or specific guidance from our Supreme Court, we have attempted to resolve the particular dispute before us, fully cognizant that our words will not be the last on the subject, nor, in our opinion, should they be. We cannot alleviate the pain caused to our military families whenever one parent is deployed and sent into harm's way, though we seek to shield the children of those families from as much of that trauma as possible.
We fully recognize that the presumptively temporary nature of the deploying parent's absence from the home creates practical problems not present whenever a court tries to resolve a more typical custody dispute. By the time a plenary hearing is held, the concerns raised by the deployment may be moot, or they may have already had their effect upon the child, thus evading our well-intentioned attempts to promote his best interests. Moreover, we do not think it fair for the returning parent to now bear the burden of demonstrating another change of circumstance warranting modification.
We do not intend that our words promote the shuffling of a child back-and-forth between his parents. A judge considering a contested matter under these circumstances is entitled to utilize "`a basic principle of family lawthat the parent having physical custody of the child is generally accorded broad responsibility in making daily childrearing decisions.'" Ronan v. Adely, 182 N.J. 103, 108, 861 A.2d 822 (2004) (quoting Gubernat v. Deremer, 140 N.J. 120, 142, 657 A.2d 856 (1995)). We stress that a temporary modification of the existing custody order is only warranted when the judge determines it is in the child's best interests.
We also recognize that custody evaluations, when necessary, are time-consuming and costly. After a servicemember has been deployed, conducting one may become impractical. An evaluator may easily be able to consider the circumstances in the home the deploying servicemember left behind, but he or she will undoubtedly have difficulty in contacting the deployed parent and conducting the kind of interview that routinely occurs in such evaluations. Despite these concerns, we are convinced that when confronted with a dispute of this nature, "the courts of this State should not abdicate their parens patriae duty to decide a custody issue on the basis of the best interests of the children." Nehra v. Uhlar, 168 N.J.Super. 187, 193, 402 A.2d 264 (App.Div.), certif. denied, 81 N.J. 413, 408 A.2d 807 (1979).
In conclusion, we hold that the parental presumption does not apply when one parent seeks modification of a previously-entered court order regarding custody solely because of the other parent's impending military deployment. We further conclude that when the military deployment is likely to last a year or more and the application is contested, the parent seeking modification, having demonstrated a prima facie case of changed circumstances that affect the child's welfare, is entitled to a plenary hearing if material facts remain disputed. Thereafter, the moving parent must demonstrate that temporary modification is in the child's best interests.
We reverse the order under review only to the extent that it denied defendant's motion without prejudice. We remand the matter for further proceedings consistent *476 with this opinion. We do not retain jurisdiction.
NOTES
[1] We have fictionalized the first name of the parties' son.
[2] We have not been provided with the supporting papers regarding defendant's application for an order to show cause.
[3] We denied defendant's motion for emergent relief from the denial of her application for an order to show cause.
[4] The statute provides that "no judgment or final order shall be entered" against someone "in the military service[]" ... "until after the court shall have appointed an attorney to represent [the party] and protect his interest...." N.J.S.A. 38:23C-4. Here, plaintiff was represented by counsel and did not object to the judge's consideration of the motion. At oral argument before us, plaintiff reiterated, through counsel, that although he was on active military duty, he did not object to our consideration of the issues presented.
[5] This was a factual error made by the judge, since plaintiff did not marry his present wife until 2006.
[6] That statute provides in pertinent part:

In case of the death of the parent ... in whose custody the child[] actually [is], when the parents have been living separate and no award as to the custody of such child[] has been made, the care and custody of such minor child[] shall not revert to the surviving parent without an order or judgment of the Superior Court to that effect. The Superior Court shall have the right, in an action brought by a guardian ad litem on behalf of the child[], to appoint such friend or other suitable person, guardian of such minor child[], and shall have the right to remove such guardian, and to appoint a new guardian or guardians, and to make such judgments and orders, from time to time, as the circumstances of the case and the benefit of the child[] shall require.
[N.J.S.A. 9:2-5.]
[7] Other cases involving the temporary military deployment of one spouse do not explicitly discuss the parental presumption, but do apply the best interests analysis to decide the award of custody. See In re Marriage of Grantham, 698 N.W.2d 140 146 (Iowa 2005) (finding best interests results in an award of custody to the non-deploying spouse); Erickson v. Blackburn, 169 S.W.3d 69, 78-79 (Mo. Ct.App.2005) (finding best interests of child warranted custody modification in favor of spouse who was likely to deploy in near future). See Jay M. Zitter, Annotation, Effect of Parent's Military Service Upon Child Custody, 21 A.L.R.6th 577 (2007), for a discussion of the effect of military status on custody disputes in general, and a comprehensive survey of cases from various jurisdictions.
[8] Plaintiff advised us at oral argument that he is anticipating return from Iraq in February 2010. We were further advised that plaintiff had been granted leave and was actually spending time with his son when the case was argued before us.
[9] The potential effects of a parent's military deployment upon a child and other family members have been well documented and are continually being studied. See James Dao, Deployment Taking Toll on Military's Children, N.Y. Times, Dec. 7, 2009, at A16 (citing a study by the Rand Corporation that found "children in military families were more likely to report anxiety than [other] children," and children of parents who "deployed in the previous three years," were "more likely to have difficulties in school and home" than other children); see also Abt Associates Team to Assess Impact of War Zone Deployment on Mental Health and Functioning of Military Families, Reuters, Sept. 29, 2009, http://www.reuters.com/article/pressRelease/idUS143772 + 29-Sep2009 + PRN 20090929 (noting Army's award of multi-million dollar contract to assess effect of war zone deployment upon service members and their families); Adam Levine, Experts: Parents' Deployment Puts Kids at High Risk For Problems, CNN, Sept. 2, 2009, htttp://www.cnn.com/20 09/HEALTH/09/02/military.kids.stress/index.html (noting a study published in the Journal of Developmental and Behavioral Pediatrics that found "[a] third of military children surveyed who have a parent deployed in a war zone are at `high risk' for psychological problems"); Stephanie Chen, When a Parent Goes to War, Military Kids Grow Up Fast, CNN, Aug. 20, 2009, http://www.cnn.com/2009/LIVING/08/20/military.teens.grow.up/inde x.html (citing Department of Defense statistics that "[m]ore than 30,000 teens between 12 and 18 have at least one parent in the National Guard deployed to Iraq or Afghanistan," and an estimate by the American Psychological Association that when all servicemembers are included, "700,000 children under the age of 18 have a parent deployed overseas for military duty").
[10] Defendant's request that another judge hear the matter on remand lacks sufficient merit to warrant further comment. See R. 2:11-3(e)(1)(E).
[11] See Deployed Troops Fight For Lost Custody of Kids: Children Taken From Single Parents in Uniform When They Are Mobilized, MSNBC, May 5, 2007, http://www.msnbc.msn.com/id/18506417/ (noting the difficulties "140,000-plus single parents in uniform fight" with respect to their custody arrangements); see also Lizette Alvarez, Iraq Looms Closer for 13,000 National Guard Soldiers, N.Y. Times, Apr. 10, 2007, at A14, available at http://www.nytimes.com/2007/04/10/us/10 reserves.html (discussing numbers of deployed and re-deployed national guardsmen and women in Iraq).
[12] Congress also amended the Servicemembers Civil Relief Act, 50 U.S.C.A. §§ 501-96 (2003), to accord those on active military duty certain protections. However, "[a]lthough these changes were important, child custody protection ... was overlooked." Christopher Missick, Child Custody Protections in the Servicemembers Civil Relief Act: Congress Acts to protect Parents Serving in the Armed Forces, 29 Whittier L.Rev. 857, 857 (2008).
[13] Family care plans are mandatory for all servicemembers pursuant to 10 U.S.C.A. § 3013 (2003). See DA Form 5305, Dec. 2005, Family Care Plan, available at http://www.armyg1.army.mil/dcs/docs/Da%20Form% 205305% 20Family% 20 Care% 20 Plan.pdf.
[14] See Crouch v. Crouch, 201 S.W.3d 463, 465-66 (Ky.2006) (interpreting the statute).