**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2537-19

K.S.,

     Plaintiff-Appellant,

v.

M.S.,

     Defendant-Respondent.

_____

Argued May 12, 2021 – Decided August 4, 2021

Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FM-03-1246-16.

Michael Confusione argued the cause for appellant (Hegge & Confusione, attorneys; Michael Confusione, of counsel and on the brief).

Ted M. Rosenberg argued the cause for respondent.

PER CURIAM

Plaintiff K.S. appeals from the November 1, 2019 order awarding her and her former husband, defendant M.S., joint legal and physical custody of their daughter, Cara,[1] and directing the child to attend school in the Mount Laurel school district, where defendant works as a guidance counselor. Plaintiff also challenges the January 1, 2020 order denying her motion for reconsideration of the November 1 order. We affirm.

I.

The parties were married in 2008 and their daughter, Cara, was born in June 2015. The marriage deteriorated shortly after Cara's birth, and following an argument in April 2016, plaintiff obtained a temporary restraining order (TRO) against defendant and relocated with the parties' daughter to her parents' home in Moorestown. Defendant remained in the former marital residence in Medford Township.

Plaintiff filed for divorce in May 2016, and on June 2, 2016, the parties entered into a consent order whereby they agreed to: share joint legal custody of Cara; designate plaintiff as Cara's parent of primary residence (PPR) and

---

[1] We use a pseudonym for the child and initials for the parties to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(13).

A-2537-19

defendant as the parent of alternate residence (PAR); share parenting time each week;[2] limit their methods of communication; and refrain from harassing each other. Although the parties worked out an alternating weekly parenting schedule, they decided a "vacation and holiday schedule [would] be decided later." Shortly after the trial court executed the consent order, plaintiff dismissed her TRO.

The parties experienced numerous problems in carrying out their coparenting arrangement. For example, they argued about Cara's medical care,

---

[2] The parenting time schedule outlined in the parties' consent order is somewhat convoluted. According to its terms, defendant generally had parenting time as follows: (1) Wednesdays from 4:00 p.m. until 8:00 p.m. unless defendant had after-school responsibilities, in which case he exercised parenting time on Tuesdays from 4:00 p.m. until 7:45 p.m.; (2) alternating Thursdays from 4:00 p.m. until Fridays at 8:00 p.m.; (3) during "week two" of a two-week cycle, Thursdays, from 4:00 p.m. until 8:00 p.m. and Fridays from 4:00 p.m. until 6:00 p.m. on Sundays. However, during the summer months, when defendant was not working, he exercised parenting time from Wednesdays at 2:00 p.m. until Saturdays at either 2:00 p.m. or 10:00 a.m. The Saturday drop-off time fluctuated based on the hours plaintiff maintained in her veterinarian office on any given Saturday. Plaintiff also enjoyed parenting time on Thursday mornings for three hours during the summer months and defendant was allotted three Saturdays per month in the summer when he enjoyed parenting time until Sundays at 8:00 p.m. Additionally, effective October 1, 2016, defendant's weekend time with Cara expanded to Thursdays starting at 4:00 p.m. until Sundays at 6:00 p.m., and plaintiff was permitted to breast feed Cara during defendant's parenting time between 7:00 p.m. and 8:00 p.m. on Fridays.

A-2537-19

how to share holidays and Cara's birthdays, and whether a party's request for a modification to the parenting schedule was reasonable. Additionally, the parties had difficulty transitioning the child from one household to the other, and each accused the other of being late for, or engaging in inappropriate behavior during parenting exchanges. Moreover, the parties disagreed about how best to communicate about the child's needs, with plaintiff preferring texts, phone calls or emails and defendant favoring communications through Our Family Wizard.[3] Also, because they could not agree on where Cara should go to preschool, plaintiff arranged for the child to attend a Moorestown preschool on Tuesdays and Thursdays, and defendant registered Cara to attend a Mount Laurel preschool on Fridays.

The parties were divorced in June 2018. Pursuant to "Stipulations of Settlement" which were incorporated into the final Judgment of Divorce (JOD), the parties resolved certain financial issues, but reserved "[a]ll issues as to custody . . . for formal hearing." During the uncontested divorce hearing, plaintiff's attorney asked plaintiff if she understood "the consent order of June 2, 2016, remains in effect until such time as a court has made a different decision

---

[3] Our Family Wizard is an online tool designed to facilitate communications between divorced or separated parents.

or made a final decision[.]" Plaintiff responded affirmatively. Her counsel further inquired, "do you understand that there's been no final decision by a judge concerning custody, parenting time, child support or any of those related issues . . . ?" Again, plaintiff responded affirmatively.

Pending the upcoming custody hearing, the parties continued to experience problems in coparenting and, at times, sought judicial intervention to resolve their disputes. For example, as reflected in an April 2019 order, a "telephone conference was necessitated by the [p]arties' inability to amicably resolve a minor issue related to parenting time during the Easter Break." The judge temporarily assigned to the matter noted in the order that he was "concerned with the inability of the [p]arties to resolve even a simple issue 'in the best interest of their child.'" Less than a month later, following another conference, the same judge entered an order, noting "[a] minor issue addressed this date involved [Cara's] field trip to Storybook Land. As a result of the schedule of the paternal grandparents, parenting time will not be modified and the child will be deprived of a trip to Storybook Land in order to spend time with paternal grandparents."

Judge Edward W. Hoffman presided over the parties' six-day custody trial beginning in July 2019. Each party, as well as plaintiff's parents, testified at the

hearing. The director of Cara's preschool in Moorestown and the principal of the elementary school where defendant worked also testified, along with a police officer involved in the parties' April 2016 domestic dispute. We highlight some of the parties' testimony to provide context for our decision.

As a threshold matter, we note the parties stipulated they would continue sharing joint legal custody of Cara, but they disagreed on which parent should be designated as PPR, where Cara should attend preschool, and where she should be enrolled for public school when she started kindergarten in 2020 because the parties resided in different towns. Specifically, plaintiff still lived with Cara at her parents' home in Moorestown, and during the trial, defendant relocated from the former marital home in Medford Township to his fiancée's townhome in Mount Laurel.

Plaintiff testified it was in Cara's best interests that she be designated as Cara's PPR because the child's personality was like hers. Plaintiff explained she and her daughter were both "happy, mellow, laid back people who have similar interests." She added she had shown she was "willing to share time with M.S.," and she took "exceptional care" of Cara. Plaintiff also stated she worked part-time so she could "be there with [Cara] as much as possible throughout her childhood."

A-2537-19

Additionally, plaintiff testified the parties' parenting time exchanges were "awful" and did not improve from the time they separated until trial, "with the exception of . . . the last couple of months" because she no longer was "made to wait at the Medford house when [she came] to pick up" Cara like she had "been for the last three years." When asked on direct examination whether there was anything she and defendant agreed upon regarding Cara, she simply answered, "No." She also stated that whenever she made a request to deviate from the parenting schedule, defendant exacted "some type of quid pro quo that exceed[ed] the time" she had requested with Cara.

Plaintiff proposed four alternative parenting schedules for the court to consider, noting she preferred a repeating three-week schedule which "lengthen[ed] the blocks [of] time" each party would have, "especially that [defendant] has." Plaintiff testified her preferred schedule "lessens the transitions and makes the transitions occur in a neutral place. And it gives both [parties] a full weekend." Asked by her attorney if she believed it was "important to lessen transitions," plaintiff responded, "Given the multitude of examples that I've given the court, and the . . . effects I see on [Cara], yes." Plaintiff also testified she believed she made decisions with Cara's best interests in mind but defendant did not do the same. By way of example, she stated he

7

demonstrated "a complete lack of respect" for her, and his "hatred and hostility" toward her was "so intense that he [didn't] have the self-control to treat [her] civilly and with respect, even in front of [Cara]."

Regarding Cara's education, plaintiff testified she wanted Cara to continue attending her current preschool in Moorestown and the following year, shift to a half-day program that ran every weekday, with each party paying for preschool costs proportionate to their incomes. Plaintiff also testified that when Cara was ready to start kindergarten in 2020, the child "should attend school in the district in which I live." The following colloquy occurred between plaintiff and her attorney:

> Counsel: What are your intentions in terms of where you're going to live? Are schools going to be a consideration for you?
>
> Plaintiff: Yes.
>
> Counsel: And in what way are they going to be a consideration?
>
> Plaintiff: It's going to be a - - a large consideration. I want her to go to a good school.
>
> Counsel: So, what school districts would you, in general, consider to be good that are in this relative area?

A-2537-19

Plaintiff: Moorestown, Haddonfield. We know they're
- - like the big - - you know, Cherry Hill. Those are the
- - the big three.

Counsel: Do you think it will be necessary for [Cara]
to attend [her daycare program in Mount Laurel] next
year?

Plaintiff: No.

Plaintiff's attorney also asked plaintiff if she was willing to accept defendant's request that there be a geographical limit on where plaintiff could live without triggering a new custody evaluation. Plaintiff testified she was not in favor of a geographical limitation because she did not "know what's going to happen." She explained her name was "still attached to the mortgage" on the marital home, she had waited three years for the home to sell, and her "ability to buy anything can't happen until [her] name [came] off of that debt" and until she received proceeds from the sale of the home.

As plaintiff's direct examination proceeded, Judge Hoffman asked for clarification regarding where she intended to live, initiating the following exchange:

Court: My impression was your plan was to continue
living with your parents in Moorestown. So, is that not
the plan?

Plaintiff: Part of it depends on when the house sells.

A-2537-19

Court: So, assuming for the sake of argument, the house sells tomorrow. Are you going to stay with your parents in Moorestown or are you going to move?

Plaintiff: I would like to stay in Moorestown.

During cross-examination, plaintiff admitted defendant had asked her for approximately a year where she intended to reside, but she was unable to answer that question. Additionally, she acknowledged she had looked for housing in Moorestown, Haddonfield and Cherry Hill, but not Mount Laurel because she did not want to live in Mount Laurel. Plaintiff stated she would "make an effort to live in close proximity to Mount Laurel" so the parenting schedules she proposed "would work." Defendant's attorney pressed on, asking, "[i]f you decide to live in Cherry Hill, . . . do you believe the schedules you proposed are going to work for transporting your daughter back and forth for transitions?" Plaintiff answered, "I think it would be challenging." She also agreed with defendant's attorney that if she "lived on the east side [of Cherry Hill], it could take an exorbitant amount of time to get to Mount Laurel from there." As cross-examination continued, plaintiff stated:

I honestly don't think or anticipate that I would move to [Haddonfield or Cherry Hill]. You would ask me where I might move, and if I move, those would be towns I'd consider because I would want to live in a town that has a good school, but quite honestly, I thought I said, and

10

if I didn't I would very much like to stay in Moorestown. That's my intention, but if I needed to move, those would be other towns I would look at. But I don't plan -- I don't have any intent or plan to move to those towns.

Defendant confirmed through his testimony that he, too, found it difficult to coparent. He stated the "biggest problem" the parties had regarding Cara was "communication." He testified plaintiff did not timely respond to his messages about Cara, and sometimes waited several days, if not longer, to respond. He also stated plaintiff "actively tried to keep [him] from [Cara's medical] appointments," and that she "has been successfully keeping me out of the majority of doctor appointments for years while simultaneously arguing that she was making no such effort to do that." Although he admitted plaintiff was "a good mother," defendant testified he believed "children do better having close relationships with both parents."

Regarding parenting time exchanges, defendant testified that historically, plaintiff or her parents made him wait an average of "about [twelve] minutes, sometimes [fifteen]" to pick up Cara. He admitted that at some point, he chose to make plaintiff wait "about five minutes" to pick up Cara. When asked why, defendant responded, "I made her wait because I was frustrated that she made me wait and I thought if she waited a little bit, she would see this is

11

counterproductive to both parties." After speaking with his therapist, defendant stopped this retaliatory practice.

Regarding his recent move to his fiancée's home, defendant stated Cara had "not resided in that house a single night." He added he "put a lot of work into [Cara's] bedroom" and had "done everything possible to . . . minimize the transition to a new place." He acknowledged during cross-examination that it was not until the trial was underway that he informed plaintiff he was engaged and had moved in with his fiancée. Additionally, he admitted his engagement and move would affect Cara, and that "it impacts [Cara]" when he does not "tell her mother what [he is] doing."

Defendant further testified that while he "pursu[ed] PPR," he intended to remain in Mount Laurel, reasoning:

> Because I work in the elementary school, we would never need before care and never need aftercare. I would be able to choose [Cara's] teachers all the way through eighth grade really. So, it would make things very easy. My new residence is just a few miles away from my school. It's also a few miles away from [plaintiff]'s residence as well. So, it's ideally located.

Defendant stated that if he became Cara's PPR, he "absolutely would agree to a condition that [he] not relocate from the Mount Laurel area," because he

believed Cara "should stay in one school district for her benefit." He expressed

the fear that if plaintiff was designated as PPR, she

> would potentially pick up and move out of the area.
> She's been in Moorestown four years, but if she's named
> [PPR], she said she may move to Haddonfield. She may
> move to Cherry Hill . . . and because she has not had a
> stable work history, she may have to move multiple
> times, which would mean [Cara] would go through
> multiple school districts.

Asked by Judge Hoffman if he would stay in Mount Laurel if he continued

as Cara's PAR, defendant responded,

> First and foremost is what a judge believes I need to do
> to maximize my time with [Cara]. I will commit to
> anything that I'm told I need to do to maximize my time.
> If you're asking what my preference is? All of [Cara's]
> friends were in the former marital residence. It was a
> great place to raise a child. So, I would be interested in
> living there but not at the cost of spending a minute
> [less] with my daughter. So, I will commit to whatever
> this court tells me to commit to, to maximize time [with
> Cara].

During his direct examination, defendant was asked what parenting

schedule he preferred. He proposed modifying the existing parenting schedule

so that during the school year, the parties would abide by a "five-two" schedule,

meaning he would have Cara with him on Mondays and Tuesdays, plaintiff

would exercise parenting time on Wednesdays and Thursdays, and the parties

would alternate weekends. For the summer months, he suggested continuing the

"five-two" schedule; alternatively, he proposed to continue the parties existing summer schedule.

On cross-examination, plaintiff's attorney explored why defendant sought a joint physical custodial arrangement, noting he agreed to less parenting time in the June 2016 consent order and in the JOD. Judge Hoffman interrupted and asked plaintiff's attorney, "Well, wait a second. So, are you telling me . . . because he's asking for 50:50 now because he didn't ask for it earlier that he's precluded from asking for it now?" Plaintiff's counsel responded, "[h]e's not precluded, but I think I'm entitled to ask him, . . . to cross-examine him on what's different, what's not different." The judge permitted plaintiff's counsel to ask additional questions about the June 2016 consent order and the terms of the JOD, but then stated:

> I just want everyone, so that there is no misunderstanding when counsel does summations, I'm not looking at it as a change of circumstance type of argument. The issue of custody and parenting time were specifically left open for determination post-divorce. So, the idea of showing a change of circumstance . . . to change what the status quo is, I'm not doing that. I'm making a custody determination and parenting time anew. So just so we're all clear on that.

Plaintiff's counsel responded to this clarification, stating, "Okay."

The judge reinforced his position as cross-examination continued, telling plaintiff's counsel, "[i]f you're making the leap that somehow [defendant] should be precluded from arguing custody and parenting time because he only agreed to a certain thing as far [as a] civil restraining order, I just don't agree with you on that." Plaintiff's counsel responded, "I understand, and I am not making that argument."

Once the trial concluded in September 2019, Judge Hoffman allowed counsel to provide written summations. On November 1, 2019, the judge modified the existing parenting time arrangement and ordered the parties to abide by a joint physical and legal custodial arrangement, effective June 28, 2020. He also ordered the parties to enroll Cara in the Mount Laurel school district as of September 2020, when she was due to start kindergarten.

In the twenty-four-page statement of reasons accompanying his order, Judge Hoffman provided a synopsis of the testimony adduced at trial, his credibility findings, and the extent to which the testimony of various witnesses impacted his decision. He specifically found the testimony of each party was "overall, . . . more truthful than not," but he did "not find that all of the positions" taken by the parties were "credible under the circumstances." After crediting the police officer's testimony regarding the parties' domestic dispute, the judge

15

afforded the officer's testimony "zero weight" in terms of its effect on his ultimate determinations. Similarly, the judge credited, but did not give significant weight to the testimony of plaintiff's mother, the director of Cara's preschool in Moorestown, or to the principal of defendant's school. The judge also found plaintiff's father "to be overall credible" and that he had "reinforced [plaintiff]'s testimony as to the difficulty with transitions (situations that play heavily in the court's ultimate determination)."

Continuing with his analysis, the judge cited to the factors set forth in N.J.S.A. 9:2-4,[4] and found all factors, other than the parties' ability to agree,

---

[4] N.J.S.A. 9:2-4(c) states, in part,

> In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality

communicate and cooperate in matters relating to the child, "stand essentially in equipoise and do not provide the court with sufficient guidance to address the ultimate decision as to the designation of [PPR]." On the other hand, he found "factor #1, the parents' ability to agree, communicate and cooperate in matters relating to the child, provides the key to determining this issue," and concluded that factor was entitled to "substantial weight."

Judge Hoffman observed that "[t]he bulk of the testimony from both parties was airing out dirty laundry of purported problems they had with one another since [Cara]'s birth," but he was encouraged there was "limited testimony as to more recent interactions" and expressed hope that "the parties are developing ways in which to co-exist with one another and focus on [Cara's] best interests rather than continuing to take shots at one another."

The judge also noted "[p]arenting time transitions have been problematic" and "[b]oth parties accuse the other of not having [Cara] ready to go on

---

of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

scheduled pickup times." Based on their contentious history after Cara's birth, the judge stated he had

> serious concerns that the [PPR] moniker could be weaponized, meaning that the parent that has the moniker will likely utilize it in some fashion, overtly or covertly, to exert priority and/or control over the parent who does not have the moniker. This could work to defeat the joint legal custody arrangement that the parties have agreed to follow.

The judge also found neither party had "established that [Cara's] best interests would be served by designating either parent as the [PPR]."

Further, the judge determined it would not be in Cara's "best interests to make changes to her pre-school schedule at this point," so he concluded any changes to the parenting time schedule should be deferred until June 28, 2020. When looking ahead to Cara's kindergarten year, the judge took judicial notice of the fact "Moorestown and [Mount] Laurel have highly regarded school districts." He determined Mount Laurel offered a full-day kindergarten program whereas Moorestown only offered a half-day program, with the option to pay $3700 per year for a full-day program. He also noted plaintiff "did not commit to absorbing the cost of the full-day program in Moorestown."

Additionally, Judge Hoffman expressed concern about the "stability and consistency" of Cara's schooling, adding "the [c]ourt feels very strongly that

A-2537-19

[Cara] maintain a consistent routine" and that she start and complete her schooling in one district. He found defendant was committed to residing in Mount Laurel, but plaintiff "was unsure of her future living plans," and that while she

> testified that it is her desire to remain in Moorestown, she has not ruled out moving elsewhere, including Marlton, Cherry Hill or Haddonfield.[5] If Mother was the [PPR] and moved, then [Cara's] school would need to change. Based upon Mother's own testimony, this is a realistic possibility and not just a hypothetical situation.

Accordingly, the judge concluded it would be in Cara's best interests to attend public school in Mount Laurel.

A few weeks after the judge rendered his decision, plaintiff moved for a limited retrial on the issue of where Cara would attend school, and specifically requested the judge reconsider his decision to have Cara attend school in the Mount Laurel school district. Plaintiff also asked the court to reconsider its decision not to impute income to defendant for the period covering his summer recess from school. Defendant filed a cross motion, seeking enforcement of the

---

[5] The parties agree that the trial court mistakenly recalled plaintiff's testimony to include the possibility she would move to Marlton.

parenting time order, including the holiday schedule, and he requested counsel fees.

Following oral argument on January 17, 2020, Judge Hoffman issued an order denying plaintiff's motion as well as defendant's cross motion for counsel fees. He also directed both parties to abide by the parenting time and holiday schedule. In an eight-page opinion accompanying his order, the judge rejected plaintiff's claim that he improperly barred her from offering rebuttal testimony about the Moorestown school district. He explained

> [b]oth Mount Laurel and Moorestown are widely regarded as being wonderful schools. The court would not be in a position to properly determine which one is better. . . . In addition, if Mother did provide rebuttal and her testimony was as she proffers in this present application, this testimony would not have changed the court's ultimate determination.

Additionally, the judge did not accept plaintiff's arguments that: his November 1 decision unfairly burdened her with transportation and day care costs; the new arrangement would compel her to interact with defendant's colleagues with whom he "certainly shared [his] negative opinions of" her; and the court failed to consider Cara's "deep connection to the Moorestown community." The judge reiterated his concerns about a party "weaponizing" the designation of PPR, noted Cara might receive a tangible benefit by attending

school in the district where her father worked, and he stated "the certainty of knowing that [Cara's] school will be stable for thirteen years, especially given the stability issues she has already endured in her young life, was an important consideration for the court." He again noted plaintiff "did not make a commitment" to reside in Moorestown throughout Cara's elementary school years. Moreover, the judge "decline[d] to give any weight" to plaintiff's suggestion that Cara, "at her young age, is so firmly established in the Moorestown community that her not attending school there is somehow against her best interest." Ultimately, the judge concluded plaintiff failed to establish the court rested its decision "based upon a palpably incorrect or irrational basis, or that it is obvious . . . the court either did not consider, or failed to appreciate the significance of probative competent evidence."

## II.

On appeal, plaintiff argues as follows:

### Point I.

> The family judge's custody and parenting time decision is an abuse of discretion because the testimony presented at the hearing below showed that uprooting the young child from the only home, family, friends, school, and community she has ever known, and away from the care of her primary caretaker mother, is not in the child's best interests.

21

A. The family judge applied the wrong legal standard to the custody and parenting time determination because there already was an existing June 2, 2016 Consent Order designating plaintiff as the parent of primary residence and primary caretaker for the parties' daughter – a Consent Order that had been in place and followed for three years by [the] time of the hearing below (not argued but raised).

B. Even if an initial custody determination standard applied, the substantial credible evidence does not support the judge's decision to refuse to designate the mother as the parent of primary residence and primary caretaker of the young child, and to rip the child away from her school and existing Moorestown community of family and friends so she can live in a condominium owned by the girlfriend of her father and attend school in a district where she has never been enrolled and has no family or friends.

We are not persuaded.

As a threshold matter, we conclude plaintiff's Points I and I.A. lack merit. R. 2:11-3(e)(1)(E). In short, plaintiff's argument that the effect of Judge Hoffman's decision was to "uproot" Cara "from the only home, family, friends, school, and community she has ever known" is belied by the record. In fact, the evidence presented at trial confirms Cara spent considerable time with each parent and attended school in both Moorestown and Mount Laurel pendente lite. Moreover, the record reflects Judge Hoffman was not required to find changed circumstances before addressing the parties' closely related parenting time and

educational issues, and plaintiff conceded as much at the final hearing and during the custody trial. Additionally, the JOD specifically reflected that "[a]ll issues as to custody are reserved for formal hearing."

Regarding Point I.B., we are not convinced the trial court abused its discretion in awarding the parties joint physical and legal custody or in directing Cara to attend public schooling in Mount Laurel. "Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Cesare, 154 N.J. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). As such, "an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Stated differently, unless the trial judge's factual findings are "so wide of the mark that a mistake must have been made," they should not be

disturbed on appeal, even if this court would have not made the same decision. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). On the other hand, "we owe no deference to the judge's decision on an issue of law or the legal consequences that flow from established facts." Dever v. Howell, 456 N.J. Super. 300, 309 (App. Div. 2018) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Our Legislature has determined that it

> is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy.
>
> [N.J.S.A. 9:2-4.]

"[I]n promoting the child's welfare, the court should strain every effort to attain for the child the affection of both parents rather than one." Beck v. Beck, 86 N.J. 480, 485 (1981) (quoting Turney v. Nooney, 5 N.J. Super. 392, 397 (App. Div. 1959)). A custody decision "must foster, not hamper," a "healthy parent-child relationship" with both parents. Nufrio v. Nufrio, 341 N.J. Super. 548,

550 (App. Div. 2001).  A parent's enumerated rights on custodial matters are qualified, however, by the multiple factors set forth in N.J.S.A. 9:2-4, which require courts to evaluate the child's best interests.  See Faucet v. Vasquez, 411 N.J. Super. 108, 118 (App. Div. 2009) (stating "the touchstone" of all custody cases is the child's best interests).

Guided by these principles and having conducted a de novo review of the trial court's legal conclusions, we cannot conclude Judge Hoffman abused his discretion by implementing a joint legal and physical custodial arrangement for Cara and ordering her to attend school in the Mount Laurel school district.  Even if we might not have reached the conclusions Judge Hoffman did, we perceive no basis to second-guess his factual and credibility findings, which are supported by "adequate, substantial and credible evidence" in the record.  Rova Farms, 65 N.J. at 484.  Moreover, we decline to disturb the judge's legal conclusions, noting he considered the requisite statutory factors under N.J.S.A. 9:2-4 and tied his factual findings to these factors.  For example, concerning the parties' history of domestic violence, he stated, "both parties made allegations against the other as to certain behaviors over the years" and the TRO obtained by plaintiff "was issued and then was adjudicated."  The judge also found both parties were fit to parent, Cara would be safe in either party's care, both

Moorestown and Mount Laurel had "highly regarded school districts," and based on the parties' current residences, there were "no geographical proximity issues."

The judge also considered the amount of time the parties spent with Cara prior to and subsequent to their separation, finding that "post-separation," the parties enjoyed a "shared parenting arrangement." Although there was no dispute plaintiff was Cara's primary caretaker up until the custody trial, the judge determined "the parties have been following a shared parenting schedule whereby both parents spend significant time with [Cara]," and "[b]oth parties agree that the existing parenting time schedule is flawed and needs modification." Further, the judge recognized "[p]arenting time transitions have been problematic," thereby implicitly accepting the testimony of the parties and plaintiff's father. For these and other reasons, the judge determined it was in Cara's best interests "to be with her parents for blocks of time in such a way as to minimize direct transitions." He stated, "[t]he end goal, of course, is to end the strife between the parents so that they can effectively co-parent for [Cara's] best interests." Accordingly, we decline to conclude, as plaintiff urges, that it was error for the trial court to find a joint legal and physical custodial arrangement would serve Cara's best interests.

We also are not convinced it was error for Judge Hoffman to find it was in Cara's best interests to attend school in Mount Laurel, rather than Moorestown, once she started kindergarten. As we have previously stated,

> [i]n the context of the best interests of a child, any evaluation of a school district is inherently subjective. . . . The age of its buildings, the number of computers or books in its library and the size of its gymnasium are not determinative of the best interest of an individual child during his or her school years. Equally, if not more important, are peer relationships, the continuity of friends and an emotional attachment to school and community that will hopefully stimulate intelligence and growth to expand opportunity.
>
> [Levine v. Levine, 322 N.J. Super. 558, 567 (App. Div. 1999).]

Here, Cara attended preschool in both Mount Laurel and Moorestown prior to and during the custody trial. Further, Judge Hoffman took judicial notice that both the Moorestown and Mount Laurel schools were "widely regarded as being wonderful schools" but Mount Laurel had the added benefit of offering a full-day kindergarten program "at no cost, while there is a substantial cost for Moorestown full-day." He added,

> if both schools are good and one is free and the other costs money, why [not] choose the one that is free[?] Payment is obviously a concern for Mother as evidenced by her argument concerning the imputation of income [to defendant]. Mother did not commit to paying for the Moorestown program.

Also, when he considered plaintiff's reconsideration application, the judge determined he should not "give any weight to the suggestion that [Cara], at her young age, is so firmly established in the Moorestown community that her not attending school there is somehow against her best interest." Again, we cannot say the judge abused his discretion in this regard.

In sum, given our standard of review and having considered the factual findings and legal conclusions accompanying Judge Hoffman's November 1, 2019 and January 17, 2020 orders, we perceive no basis to disturb either order. To the extent we have not addressed plaintiff's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION